STATE of Missouri, Respondent,

v.

Lacey V. BELTON, Appellant.

No. WD 52813.

Missouri Court of Appeals, Western District.

Submitted Feb. 4, 1997.

Decided May 27, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 1997.

Application to Transfer Denied Aug. 19, 1997.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for respondent.

James R. Wyrsch, Charles M. Rogers, Kansas City, for appellant.

Before BRECKENRIDGE, P.J., and SMART and EDWIN H. SMITH, JJ.

SMART, Judge.

Lacey V. Belton appeals his conviction of robbery in the first degree, § 569.020, RSMo 1994,[1] for which he was sentenced as a prior and persistent offender to twenty years imprisonment. Belton challenges the sufficiency of the evidence, and seeks reversal on various contentions of trial court error. Because we find the evidence of guilt to be sufficient, and we find no trial court error warranting relief, we affirm the judgment.

## FACTUAL BACKGROUND

We review in the light most favorable to the State, granting the State all reasonable inferences from the evidence. *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). On February 10, 1995, Sharon Meyers and her young son went to the residence of Ms. Meyers' father, within a few blocks of Jacob Loose Park in Kansas City. After lunch, shortly after 1:00 p.m., Ms. Meyers took her son outside and opened the doors to her car in order to put her son into his car seat. She noticed a car driving slowly down the street toward her. The driver of the car was sitting very low behind the steering wheel. The car passed by Ms. Meyers and she noticed a strange writing on the windshield of the car, like a yellow crayon. The car came to a stop some ten feet from where Ms. Meyers was standing. A man jumped out of the car and approached Ms. Meyers with his hand in his pocket. Ms. Meyers believed that the man had a gun. He was yelling, "Give me your purse, don't make me shoot you, give me your purse." Ms. Meyers handed the man her purse, looking at his face as she did so. The man went back to his car.

Ms. Meyers made an effort to concentrate on the license plate number. She committed the number to memory, grabbed her son and ran into her father's house where she reported the incident, giving the license number to the authorities. She described the vehicle as a four-door, dark blue Buick with yellow lettering on the windshield.

Police ran the license number of the vehicle and found it registered in the name of Lori Lipka, Belton's wife. Three days later, the Independence police observed the car, stopped it, and apprehended Belton, who was driving. After being advised of his rights, Belton made a statement. Belton maintained that he was not involved in any robbery. When asked about his activities on February 10, he stated that he had taken his wife to work at the beauty salon on the Country Club Plaza at about 9:00 a.m. on the morning in question. He said that he then went to a friend's house near 26th and Askew, driving his wife's car. He said he then picked up his wife to take her to lunch at about 1:45 p.m. He said that after lunch he took her back to work, and then went to another friend's house. He declined to name the friends he was with that day when asked to do so.

Belton was photographed and his picture was shown to Ms. Meyers as a part of a photographic lineup. Ms. Meyers identified the picture of Belton as a picture of the man that robbed her. She explained that she was able to identify Belton because of his large eyes. She had examined his face at the time that she handed her purse to him. Ms. Meyers also identified a photograph of Belton's car. She noted that the car in the photograph had the same writing on the windshield that she had noticed during the robbery. At trial, Detective Thomas L. Robinson of the Kansas City, Missouri Police Department, testified that it took him from three and one-half minutes to six minutes to travel from the location where the robbery occurred to the salon where Belton's wife was employed, depending upon the traffic lights.

After hearing the evidence, the jury found Belton guilty as charged. The trial court sentenced him as a prior and persistent offender to twenty years imprisonment. Belton appeals.

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

## SUFFICIENCY OF THE EVIDENCE

■ In Point I, Belton claims that the evidence presented at his trial was insufficient to support his conviction. He claims that the evidence was not sufficient to show that he was the man who robbed Ms. Meyers. He further claims that the evidence was not sufficient to show that he threatened Ms. Meyers with a dangerous weapon. In examining a sufficiency of the evidence claim, we examine the evidence to determine whether there is sufficient evidence to permit a reasonable juror to find guilt. *State v. Storey,* 901 S.W.2d 886, 895 (Mo. banc 1995). We accept as true all evidence supporting the verdict and the reasonable inferences flowing therefrom. *Grim,* 854 S.W.2d at 405. All evidence and inferences to the contrary are discarded. *Id.* We do not, however, weigh the evidence, *State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992), or determine the reliability or the credibility of witnesses. *State v. Sumowski,* 794 S.W.2d 643, 645 (Mo. banc 1990).

Belton contends that the identification by Ms. Meyers of him and of the car was insufficient to show that he was the man that robbed her. Ms. Meyers identified Belton in a photo array, stating that she was able to get a good look at his face when she handed him her purse. She said she was struck by Belton's "large eyes." Ms. Meyers indicated that she was not one hundred percent positive of the identification. She testified that she told the sergeant that she was ninety-eight percent certain and that she was "not a hundred percent sure about anything." Ms. Meyers made an in-court identification of Belton as the man who took her purse. In court, she testified that she was certain that Belton was the man that robbed her.

Belton relies on discrepancies between Ms. Meyers description of what he was wearing and what other witnesses testified that he was wearing on the day of the robbery. He

also points out that he had five witnesses that testified that he could not be the robber because he was elsewhere at the time of the robbery.[2] Belton claims that this testimony precludes the possibility that he committed the robbery. Of course, this argument is without merit because the jury had no obligation to believe the testimony of Belton's witnesses. Reliability and credibility are issues for the jury to decide. *Id.* Testimony given by a single witness may be sufficient to make a submissible case. *Id.*

Ms. Meyers also identified photographs of the car registered to Belton's wife. She noted that the yellow lettering on the windshield of the car that she observed during the robbery also appeared on the car in the photograph. The car driven by Belton, and registered to his wife, was a four door light blue Buick. Ms. Meyers originally reported the car of the robber as a four door dark blue Buick. One of the defense witnesses described the car as light blue, with "dark blue on the bottom." The license plate reported by Ms. Meyers was an exact match to Belton's car. There was abundant evidence from which a jury could conclude that Belton was the man who robbed Ms. Meyers.

## "DANGEROUS WEAPON"

■■ Belton also challenges the sufficiency of the evidence in establishing that a "dangerous weapon" was used during the robbery as required for a conviction under § 569.020. His theory is that since Ms. Meyers did not see a weapon during the robbery, the evidence was not sufficient to establish the robber's use of a weapon. However, it is not necessary that the victim of a robbery in the first degree actually see a weapon.

> "Robbery in the first degree may be found where the victim is in fear even though there was no real possibility of injury." *State v. Collins,* 567 S.W.2d 144, 146 (Mo. App.1978). The fact that a victim per-

2. The defense presented five witnesses in the nature of alibi witnesses. One was Mrs. Belton. Three others were her co-workers from the hair salon. One was a friend of Mr. Belton. All of the salon witnesses said Mr. Belton arrived at the salon before noon and was there until after 1:00 p.m., before leaving with Mrs. Belton. Mrs. Belton said they left about 1:10 p.m. and went to

McDonald's. Ms. Flores said they left the salon between 1:15 and 1:30 p.m. Ms. Wilkes said they left the salon about 1:20 to 1:30. Mr. Daniels, a friend of Mr. Belton, testified he saw Mr. and Mrs. Belton at McDonald's between 12:00 noon and 1:00 p.m. The defendant elected not to testify.

ceives there to be a weapon that remains unseen is sufficient whether or not, in fact, such a weapon exists. *Id.* Whether or not the object that is perceived as a deadly weapon or dangerous instrument is in fact capable of producing harm is unimportant. The threat to use the object to produce harm transmogrifies it into a dangerous instrument. *See State v. Anderson,* 663 S.W.2d 412, 416 (Mo.App.1983).

*State v. Archer,* 814 S.W.2d 315, 317 (Mo. App.1991).

The robber jumped out of his car and approached Ms. Meyers with his hand in his pocket. Ms. Meyers testified that she thought that the robber had a gun. The robber yelled, "Give me your purse, don't make me shoot you, give me your purse." The evidence is sufficient whereby a reasonable juror could have concluded that Ms. Meyers believed that Belton was threatening to use a dangerous weapon, even though she did not see such a weapon. Point I is denied.

## CLOSING ARGUMENT

In Point II, Belton alleges various errors were made during the State's closing argument. Belton did not object to most of the statements he alleges were error, and asks this court for a plain error review of the argument. Review for plain error is undertaken pursuant to Rule 30.20. *State v. Parker,* 886 S.W.2d 908, 922 (Mo. banc 1994), *cert. denied,* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). In *State v. Varvera,* 897 S.W.2d 198, 201 (Mo.App.1995), the Southern District clarified the mechanics of plain error review:

> *Plain error* and *prejudicial error* are not synonymous terms. *State v. Valentine,* 646 S.W.2d 729, 731[4] (Mo.1983). Relief under the plain error standard is granted only when an alleged error so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *State v. Hadley,* 815 S.W.2d 422, 423[1] (Mo. banc 1991). Appellate courts use the plain error rule sparingly and limit its application to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice.

*State v. Collis,* 849 S.W.2d 660, 663[1] (Mo. App.1993). The determination of whether plain error exists must be based on a consideration of the facts and circumstances of each case. *State v. Cline,* 808 S.W.2d 822, 824[5] (Mo. banc 1991). A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice. *State v. Harrison,* 864 S.W.2d 387, 389[3] (Mo.App.1993).

Belton has not met this burden and application of the plain error rule is not called for under the facts of the instant case.

Furthermore, it is extremely rare for a court to grant relief based upon assertions of plain error pertaining to the State's closing argument. This is "because, absent an objection, the trial court's options are limited to an invited interference with summation, which increases the risk of error." *Storey,* 901 S.W.2d at 897.

■■■■ Belton complains that the State referred to facts not in evidence during closing argument, misstated the evidence and presented personal opinions. The prosecutor has the right to argue the evidence and the reasonable inferences drawn from the evidence. *Clemmons v. State,* 785 S.W.2d 524, 530 (Mo. banc), *cert. denied,* 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). It may be permissible for a prosecutor to refer to facts that are not before the jury so long as those facts do not imply any special knowledge of evidence pointing to a defendant's guilt. *State v. Newlon,* 627 S.W.2d 606, 617 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). As a general rule, an argument made by the prosecutor which does not misstate or manipulate the evidence and does not implicate specific rights is constitutionally permissible. *State v. Ramsey,* 864 S.W.2d 320, 330 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). The argument Belton finds offensive is merely a comment about the audacity of the daylight robbery of Ms. Meyers in the presence of her young son. We fail to see any basis for plain error review as to this matter. Point II is denied.

## VISITS WHILE INCARCERATED

In his third point, Belton alleges that the trial court plainly erred in allowing the State to question Lori Belton, the appellant's wife, about her visits to her husband while he was incarcerated. Belton contends that this question improperly shifted the burden of proof by inferring he was guilty until proven innocent. No objection was made to the question at the time that it was asked. The prosecution was pursuing a line of questioning designed to show Mrs. Belton was biased. He asked Mrs. Belton if she loved her husband. After her affirmative reply, she was asked, "In fact, you've been over to see him every day or almost every day that he's been incarcerated; is that right?" The witness was married to Belton, and acknowledged that she loved him. That was sufficient to demonstrate bias. The prosecution presumably also wished to hint that Mrs. Belton was active in the planning of her husband's defense, as though that were some indication of his guilt or her bias. In our view, however, how often she visited him is not a matter of great materiality, and, under the circumstances, the question unfortunately served to remind the jury that Mr. Belton had been incarcerated. In *State v. Kirk*, 636 S.W.2d 952, 955 (Mo.1982), the appellant complained about the cross-examination of his fiancée concerning how may times she visited him in jail. As in this case, no objection was made to the question. The court found no "manifest prejudice" in the question. *Id.* Here, also, we see no manifest injustice caused by the question. However, we agree with Belton that the question was unnecessary. We admonish the prosecution to avoid unnecessary questions which draw attention to the defendant's incarceration.

## QUESTION ABOUT TAKING THE DOG TO THE PARK

Belton also challenges the State's cross-examination of Lori Belton as to whether she and her husband might have taken their dog to Loose Park for a walk that day. Loose Park is near the crime scene. Belton claims that there was no good faith basis for the prosecutor to ask these questions. Belton assigns prejudice in that it allowed the jury to infer that Belton had the opportunity to commit the crime. The trial court found that the questions were based on fair inferences from the evidence. We agree. It was a permissible question under the circumstances, and we presume it was asked in good faith.

## FAILURE TO TELL POLICE ABOUT THE FRIENDS HE WAS WITH

In his final point, Belton contends, *inter alia*, that certain responses made by Detective Thomas Robinson to questions asked by the State were improper. Belton had filed a motion in limine before trial attempting to keep some of these responses out of evidence. A motion in limine preserves nothing for review, however. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992). Belton did not object to most of the evidence that he now complains about on appeal. He has not preserved these matters for appeal. *State v. Goodwin*, 891 S.W.2d 435, 436 (Mo. App.1994).

Belton did object at trial to the question, "Did you ask the defendant anything about the friends that he was visiting?" Detective Robinson answered, "He wouldn't name the person that he had been visiting." The court overruled the objection. Belton claims that the testimony was irrelevant and should have been excluded. We fail to see any error, however. Belton's refusal to name the friends he claimed he visited that day was relevant. At the time of this questioning, Belton had not yet been informed of the time of the robbery of which he was suspected. It would be reasonable for Belton to suppose that one of his friends might supply an alibi. It could be inferred that his refusal to give Detective Robinson any names is indicative of the fact that he was not telling the truth about his activities on the day of the robbery. "Any statement indicating a consciousness of guilt is admissible." *State v. Girardier*, 801 S.W.2d 793, 796 (Mo.App.1991).

## MRS. BELTON'S CHANGE SINCE THE MARRIAGE

Belton also preserved error as to questions asked of Mary Flores, a co-worker

of Lori Belton. The following occurred during cross-examination of Ms. Flores by the prosecution:

Q. And you knew her before she was married to Mr. Belton?

A. Yes, I have.

Q. Have you seen a change in her behavior since she was married to Mr. Belton?

[defense counsel]: Your Honor, I would object to this as irrelevant.

THE COURT: Overruled.

Q. You can answer the question, please.

A. Could you repeat the question?

Q. Okay. You've known Mrs. Belton, formerly Lori Lipka, you knew her before she was in a relationship with this man, the defendant?

A. Yes, sir.

Q. And my question to you was, have you seen her behavior change since she's been with this defendant?

A. No.

Q. Okay.

A. I only know her on a business and a work—at work, and that's it. I have no contact with her outside of work, so, you know, when I see her during the day and how she performs, she's the same to me.

Q. Do you recall saying that at the time Lori approached you last fall that you were very worried about Lori?

A. Yes. I—

Q. You were very concerned about Lori?

A. Yes, I did say that.

Q. Isn't that because you had seen her change over the period of time that she had been with this defendant?

A. From that time that she approached me I didn't know what was going on with her, and I didn't ask her. But yes, I did see a change, but it was just at that time before she approached me.

Q. And, in fact, you've seen changes in her in the way she keeps her finances; isn't that right?

[defense counsel]: Your Honor, I do protest. These are collateral issues.

THE COURT: Well, overruled.

A. Yes.

Q. Since she's been with this defendant, Mr. Belton, she's not had the money she used to have; is that right?

A. I don't know, sir.

Q. Do you recall telling me that in the elevator on February 9?

A. I recall talking and it was said off the record.

Q. Well—

A. And that's what you said too.

Q. I'm asking you today. We're in court.

A. With you, I asked you when we were talking in the elevator, I said off the record, I said yes, I am worried about her, and you said to me, "This is between us." I asked you, so I don't understand now—

Q. I just want the truth, ma'am, okay? That's all we want. These people need to make a decision. Have you seen a change in Lori Belton since she's been with this defendant?

A. No.

Q. Even though you've seen and noticed the fact that her finances are much less now than they were before, you don't consider that a change?

A. Her finances are really none of my business.

Q. And you're telling us now, you know, you're very concerned and worried about Lori Belton; that it's just a professional relationship between you and her and you don't know her very well; is that what you're telling us?

A. I only know her from work. I don't have a day-by-day conversation with her on the phone or nothing, but yes, you get to know people. You're just like a family there in a business. you get to know and you sense things just like you probably do on your job.

Q. Absolutely. And you were concerned?

A. Yes, I was, but that was kept to myself.

Belton contends all of this was irrelevant, and an attempt to impugn his character, and to play to the racial prejudice of the jury because, he says, Lori Belton is Caucasian

and the defendant is an African–American. The state argues that the questions were relevant to the extent to which the financial status of the marriage is relevant as to motive. The state points out that wide latitude is allowed in developing evidence as to motive, citing *State v. Mallett*, 732 S.W.2d 527, 535 (Mo. banc), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). We agree that "[w]here the defendant claims innocence, evidence of motive, or absence of motive, is relevant." *State v. Shurn*, 866 S.W.2d 447, 457 (Mo. banc 1993), *cert. denied*, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). In this case, unfortunately, the prosecution did not ask the witness, "did you observe any matters related to the Beltons' financial condition." Instead, he asked, "have you seen a change in Mrs. Belton's behavior since she was married to Mr. Belton?" While the fact that the Beltons may have had financial need would have had some degree of relevance, what was not relevant was the suggestion that Mrs. Belton had been doing well until she married the defendant, and now she was having some kind of behavior change because of him. The witness denied observing any change in Mrs. Belton after she married the defendant, yet it was patent that the witness had told the prosecution some things "off the record." It is unclear exactly what the prosecution was seeking, but apparently it had to do with financial difficulties Mrs. Belton was having. Although we conclude that the trial court's rulings were within its discretion, we believe the trial court would also have done well to sustain the objections to the extent that the questions suggested that defendant had a negative influence on his wife. Questions such as these, in a close case, can pose a risk of unfairly influencing juror attitudes toward a defendant. The prosecution must remember that *the law does not permit the use of general evidence of bad character as evidence of guilt*. *State v. Sladek*, 835 S.W.2d 308, 314 (Mo. banc 1992) (Thomas, J., concurring). Evidence of bad character is not rejected because character is logically irrelevant; on the contrary, bad character is "said to weigh

too much" with the jury and "to so overpersuade them" as to prejudge a defendant and to deny him a fair opportunity to defend against a particular charge. *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948). Here, the witness' responses did not support the notion that the defendant was bad for Mrs. Belton, except that the witness did acknowledge a change in the way Mrs. Belton "keeps her finances." We assume there was no conscious effort here to suggest to the jury that the defendant is a bad man, an unscrupulous person who takes advantage of a good woman. Also, we assume there was no intent to play the race angle.[3] Because the trial court rulings were within its discretion, and because the answers of the witness were related to finances, we find no error warranting reversal in this line of questioning.

Judgment is affirmed.

BRECKENRIDGE, P.J., and EDWIN H. SMITH, J., concur.

---

**3.** However, this line of questioning did not distinguish the prosecutor. Moreover, it appears the prosecutor may have breached a confidence with the witness. The prosecutor did not deny the witness's assertion that he had told the witness that her comments were "off the record" as to some items. The result of the whole dialogue was that the prosecutor ended up looking unprofessional and "tricky."