**James Earl VAUGHAN, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 31216.**

Missouri Court of Appeals,
Western District.

March 2, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 1981.

Alex Bartlett, Jefferson City, for appellant.

John Ashcroft, Atty. Gen., and Darrell Panethiere, Asst. Atty. Gen., Kansas City, for respondent.

Before PRITCHARD, P. J., and SWOFFORD and MURPHY, Senior Judges.

J. DONALD MURPHY, Senior Judge.

Appellant appeals from the denial, after an evidentiary hearing, of his Rule 27.26 motion to set aside judgment and sentences for rape and sodomy. We affirm.

On August 11, 1975, appellant pleaded guilty to three counts of a four-count indictment and on August 25, 1975, was sentenced to forty years for rape, ten years for sodomy and ten years for another rape, the three sentences to be served concurrently. The fourth count (sodomy) was dismissed. All counts specified the same victim and the same date.[1]

Appellant makes two allegations of error:

One, appellant was unconstitutionally subjected to double jeopardy because the two rape convictions arose out of the same incident involving the same victim and constituted only one offense.

1. At the same sentencing hearing, appellant was given an additional ten-year consecutive sentence for the crime of assault with intent to ravish based upon a previous plea of guilty to one count of a three-count indictment specifying two other victims and a different date.

The court also revoked a previous order of probation granted appellant on a six-year unexecuted sentence for a drug-related offense and ordered the sentence served consecutively.

Two, the sentences were unconstitutionally tainted by the personal interest of the prosecuting attorney by reason of his relationship with the prosecuting witness.[2]

Initially we address respondent's contention that the trial court had no jurisdiction to entertain the 27.26 motion because there had been a prior 27.26 proceeding resulting in a ruling adverse to appellant. The record of that prior hearing has not been filed as a part of the record on this appeal and we do not know what issues were there raised. Generally the trial court will not entertain successive 27.26 motions. *Endres v. State*, 549 S.W.2d 582 (Mo.App. 1977); Rule 27.26(d). There are exceptions, however: If there are new facts or new constitutional principles which could not have been known to the petitioner at the time of the first motion, the court will not foreclose a second motion based on these new grounds. *Brown v. State*, 581 S.W.2d 407 (Mo.App.1979); *Steinlage v. State*, 581 S.W.2d 849 (Mo.App.1979); *Perry v. State*, 579 S.W.2d 728 (Mo.App.1979). Here there was testimony by appellant that the alleged personal relationship between the prosecuting attorney and the prosecuting witness was not known to him at the time the plea was entered, and apparently the trial court felt this testimony satisfied the appellant's burden of showing that the evidence was newly discovered. Moreover, counsel stipulated at the second 27.26 hearing that the prior 27.26 motion would not be a bar to the second motion so far as it pertained to the claim of prosecutorial bias. The trial court elected to consider both issues on the merits—the issue of double jeopardy evidently only as a matter of grace—and we shall similarly review them here. *Brown v. State, supra*, 581 S.W.2d at 410.

*The Issue of Double Jeopardy*

Appellant's contentions require a detailed statement of the testimony adduced both on the plea of guilty on August 11, 1975, and at the 27.26 hearing on March 1, 1979.

Sometime before 2:24 a.m. on June 22, 1974, the appellant Vaughan entered through a window into the second-story apartment of the victim and awakened her by grabbing her around the neck. When she screamed he struck her with a "karate stick" consisting of two sticks joined together by a chain, and threatened to kill her. Appellant tied the arms of the victim behind her, attempted intercourse with her and then committed sodomy upon her. He then raped her. The act of rape occurred at approximately 3:00 a.m. Afterward, while she continued to lie on the bed with her arms tied behind her, he "moved over and sat on the bed" and talked to her. He told her that he would untie her if she would promise "not to try anything". She told him she would "rather stay tied." She pleaded with him to leave, saying that she was expecting her boyfriend. There was then some conversation about how he had gained entrance to the apartment and how he proposed to leave. The subsequent events and conversation between appellant and victim up until the time of the second act of intercourse were related by her in a deposition received in evidence, as follows:

"Q. Then, ... what happened next?

"A. OK, then, after I asked him to leave again, he asked me what my name was and I told him my name was Alice ... and he asked me where I was from, and I told him that I was from a farm in Northern Missouri. And he asked me several questions, and I don't remember everything that he asked me. Then, I asked him to leave again. I said that he just had to leave before my boyfriend got there and he asked what my boyfriend's name was and I told him that his name was Greg ... and I said that we were planning to be married and if he had found out that I had been raped, that he prob-

---

2. Appellant also claimed he received ineffective assistance of counsel on his plea of guilty because he did not know and was not advised by counsel that penetration was an element of rape. The trial court ruled the point against appellant and appellant has not preserved the issue on appeal. The claim is frivolous.

ably wouldn't marry me. Then, at that time, he said, 'Baby, you would be really wise not to tell anyone what has happened. He said, I have alot [sic] of friends who would come back and make you very sorry that you told.' At that time I said, if you would just leave, just leave me tied, then I wouldn't leave, I wouldn't tell anyone, until Greg gets here. I wouldn't leave. And he said I can't do that because then your boyfriend would know something was wrong if he came in and you were tied up. So, he said that he wasn't going to leave until he had f——— me again. Then, I started crying and shaking and he grabbed my arm and he told me to shut up. Then, he laid down beside me and started stroking my leg and whispering in my ear, and he said, 'You're [sic] body is really beautiful, baby, you're really beautiful. And at that time, he untied me and I asked him to please leave again and I cried during most of this time I know and he said, 'baby, everyone in this world has to give something and everyone has to take something and I'm not hurting you, am I?' And I said, 'I'm so nervous that I can hardly stand it. I just wish that you would leave.' And he said, 'Baby, we're going to ball again. And he asked me to turn over, on my stomache [sic], and I turned over on my stomache [sic] and he tried to enter me from behind without success. Then, he told me to get on my knees and I said, 'I'm too nervous to get on my knees. I can't get on my knees.' Then, he grabbed my arm and twisted it and he said, 'you'd better cooperate.' So I got on my knees and I started crying and shaking and he tried to enter me but he couldn't. So, he told me to lay back down and I laid back down on my back. He told me to lay on my back and I laid on my back. And he tried to enter me

again and he couldn't. And he said, 'Baby, you're going to have to blow me again' . . . and I . . .

\* \* \* \* \* \*

"Q. Between the time that the first intercourse had happened until this was building up to the second one, how long a period of time had elapsed? Do you recall, or can you guess, roughly?

"A. I would say probably 25 minutes."

Appellant then forced the victim to commit another act of oral copulation and immediately thereafter had forcible sexual intercourse with her for the second time. He was interrupted by the sound of the arrival of the boyfriend and fled through a window. The time was then 3:55 a.m., approximately 90 minutes after appellant's entrance into the apartment and 55 minutes after the first act of intercourse.

The trial court found the following facts relevant to the double jeopardy allegation:

"[A]fter grabbing the prosecuting witness by the throat, striking her with two sticks joined by a chain, and threatening to blow her brains out, [appellant] tied her hands behind her and forcibly raped her. Thereafter [appellant] perpetrated forcible sodomy on the victim . . . threatened her with retaliation by his friends, stated that he intended to have her a second time, and forcibly raped her again . . . Although the above events occurred during a span of approximately thirty-five to forty minutes, '. . . An intent formed to rape her again. The evidence of the second rape is entirely additional to that of the first. Additional orders were given to the captive female, an intent to have her again was formed and manifested, and the crime was committed. Certainly there was separate and additional fear, humiliation and danger to the victim . . .', [quoting *Lillard v. State*, 528 S.W.2d 207 (Tenn.Crim.App.1975)] . . . It therefore appears that [appellant] is not being punished twice for the same offense, but for separate offenses..."

■ We limit our review on this appeal to a determination of whether the findings and conclusions and the judgment of the trial court are clearly erroneous. Rule 27.-26(j). "A finding is 'clearly erroneous' if, after reviewing all the evidence, the court is left with the definite and firm conviction that a mistake has been committed." *Bennett v. State*, 549 S.W.2d 585, 586 [1, 2] (Mo.App.1977); *Renfro v. State*, 606 S.W.2d 473 (Mo.App.1980).

The record relevant to the double jeopardy question was made by entering the deposition of the victim into the record. This testimony was not contradicted. The appellant, however, argues that even if the testimony is admitted to be true, the facts established thereby are not sufficient, as a matter of law, to demonstrate that two rape offenses were committed. Appellant argues that the testimony establishes only "one incident involving one person" and "an initial use of force and lack of consent which simply continued through the episode." We disagree.

■ This court has held that "[g]enerally rape is not a continuing offense, but each act of intercourse constitutes a distinct and separate offense." *State v. Dennis*, 537 S.W.2d 652 (Mo.App.1976). Whether multiple assaults resulting in rape constitute multiple crimes or a single crime are determined by the facts of each case, including the factors of time, place of commission and, preeminently, defendant's intent, as evidenced by his conduct and utterances. *State v. Dennis, supra; Lillard v. State*, 528 S.W.2d 207 (Tenn.Cr.App.1975); *Harrell v. State*, 88 Wis.2d 546, 277 N.W.2d 462 (1979); *People v. Brown*, 66 A.D.2d 223, 413 N.Y. S.2d 482 (1979); *Mikell v. State*, 242 Ala. 298, 5 So.2d 825 (1942); *Hamill v. State*, 602 P.2d 1212, 1216[1, 2], 1217[3] (Wyo.1979).

Although the *Dennis* decision recognizes the importance of the factors of time and place (the victim in that case was assaulted in one county and then taken by automobile approximately 70 miles to another county where she was again assaulted), the court gave preeminence to the question of whether a second intent and a second application of force had been proven:

"But even more germane to the question than the time interval is the fact the defendant formed the intent to again assault the victim ... and *again* applied the force necessary to accomplish his purpose and thereupon completed a separate and distinct act." *State v. Dennis, supra*, 537 S.W.2d at 654.

■ The same reasoning applies to the present appeal, in which, although both assaults took place at the same location, there was a substantial time interval between the assaults (variously estimated to be 25 minutes, 25 to 30 minutes, and 55 minutes), during which time the appellant sat on the bed and engaged the victim in extended conversation, expressed his intent to rape her again, threatened her and physically abused her. His actions clearly evinced an intent to rape her a second time and his utterances at the time of the commission of the offense and at the time of the entry of this plea of guilty indicated he conceived in his own mind a second separate intent to gratify his sexual desires.

In *Harrell v. State, supra*, the factual context presented to the Court of Appeals of Wisconsin was remarkably similar to the factual setting of the present appeal: Both rapes in each case took place at the same location, the time interval in *Harrell* was 20 to 25 minutes and in the instant case 25 minutes or longer, the elapsed time between assaults was spent in conversation between the assailant and the victim and no other event or persons intervened between the two rapes. The Wisconsin Court cited *Dennis* with approval, and affirmed the defendant's conviction on both counts of rape. The Wisconsin court said:

"Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder,—an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault commit-

ted. Each act is a further denigration of the victim's integrity and a further danger to the victim." *Harrell v. State, supra,* 88 Wis.2d 546, 277 N.W.2d at 469.

We conclude that the trial court did not err in finding that appellant was properly charged with and convicted of two counts of rape without contravention of double jeopardy principles.

### The Issue of Prosecutorial Bias

At the time of the plea of guilty on August 11, 1975, appellant was carefully questioned by the court, made aware of his rights as a defendant and informed of the range of punishments authorized by statute. He was specifically advised by the court that recommendations by the prosecuting attorney or defense counsel were not binding and might be ignored by the court. In response to a question he acknowledged he had twice had intercourse with the victim. The prosecuting attorney recommended sentences of 75 years on Count I (rape), 10 years on Count II (sodomy) and 10 years on Count III (rape), the sentences to run concurrently. On the following day, August 12, the prosecuting attorney stated in a newspaper interview that the 75-year recommendation was "the harshest made by a Boone County prosecuting attorney in recent memory" and that 30 years was the average sentence for rape in that county.

At the sentencing hearing on August 25, 1975, the prosecuting attorney repeated his recommendations and called the court's attention to a pre-sentence investigation of the defendant which made reference to other sexual offenses committed by defendant. He told the court that the case was "one of the most serious" within his experience as a prosecuting attorney. Defense counsel advised the court that there had been plea negotiations by counsel and that he was aware of what the prosecuting attorney intended to recommend but that there was no agreement as to the sentences to be recommended. Defense counsel made a vigorous plea for leniency and suggested a sentence of 20 years on each count of rape and 10 years on the count of sodomy, the sentences to run concurrently. He called

the prosecuting attorney's recommendation of a 75-year sentence "an outrageous request".

On August 15, 1975, four days after the plea of guilty and ten days before the sentencing, the prosecuting witness and the prosecuting attorney had dinner together at the latter's home. They had two subsequent dates prior to the sentencing. The only evidence adduced at the 27.26 hearing indicating any earlier social relationship between the two was the testimony of Robert Wilson, an inmate of the Missouri State Penitentiary, who claimed he had seen them, or "two people that looked exactly like them," at a Columbia motel in the spring of 1975. He admitted that he had not seen the two individuals before the encounter in the motel and that he never saw them again until a picture appeared in the newspaper in the fall of 1978. His testimony was uncorroborated. Both the prosecuting attorney and the prosecuting witness testified that their relationship was solely a professional one at the time of the guilty pleas on August 11, 1975. The prosecuting witness was, at that time and for some months thereafter, engaged to marry another man. She and the prosecuting attorney were married two and one-half years later.

The trial court found the following facts relevant to the allegation of prosecutorial misconduct:

"[A]ny and all contacts between the Prosecuting Attorney and the prosecuting witness prior to the plea of guilty on August 11, 1975, were solely in connection with the investigation and preparation of the case for preliminary hearing, for presentation to the Grand Jury, and for trial. On August 11, 1975, the recommendation complained of, to-wit: seventy-five years on Count I, ten years on Count II, and ten years on Count III, was made. Thereafter, the Prosecuting Attorney and the prosecuting witness did dine together on August 15, 1975, and had two other dates prior to August 25, 1975, the date of sentencing. Such brief association between those dates did not, and could not

have had, any effect on the recommendation which had already been made on August 11... The Prosecutor's recommendation, which was not followed by the trial court as to Count I, was not tainted by any prosecutorial misconduct...."

■ The general rule is that "[a] prosecuting attorney who has a personal interest in the outcome of a criminal prosecution such as might preclude his according the defendant the fair treatment to which he is entitled should be disqualified from the prosecution of such a case." *State v. Harris*, 477 S.W.2d 42, 44 [1, 2] (Mo.1972); Section 56.110, RSMo 1978; and a defendant thus convicted has not been afforded due process of law. *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967); *State v. Jones*, 306 Mo. 437, 268 S.W. 83 (1924).

■ In this case there was no persuasive evidence presented that such prohibited personal interest existed *at the time of the plea of guilty*. The testimony of Robert Wilson, an inmate of the Missouri State Penitentiary, who claimed that he had seen the victim and the prosecuting attorney ("or two people that looked exactly like them") at a motel almost four years prior to the 27.26 hearing was uncorroborated and patently incredible. The appellant did not rely upon it in argument and the trial court ignored it in its findings.

Appellant suggests, however, that the mutual interest which developed between the prosecuting attorney and prosecuting witness *after* the plea of guilty on August 11 and *before* the sentencing on August 25—as evidenced by the three dates—in some way rendered the sentence constitutionally invalid as being fundamentally unfair. However, the trial court, which was in a position to judge the testimony of the parties as to the genesis of their relationship, found that "[s]uch brief association ... did not, and could not have had, any effect on the recommendation which had already been made on August 11." We find no basis for a contrary ruling by this court.

This "brief association" does not in itself reflect any excessive personal interest on the part of the prosecutor in the outcome of the prosecution or any unfairness in his handling of the plea. There was testimony, too, that the relationship between the prosecutor and the prosecuting witness only became one of personal affection by slow degrees and at a later time, culminating in marriage some two and one-half years later.

■ The only incident which appellant claims illustrates bias on the part of the prosecuting attorney was the recommendation of a 75-year sentence of imprisonment, which appellant asserts was grossly disproportionate to the normal recommendation in a rape case. The recommendation, however, was justified—arguably—by the aggravated nature of the crime and appellant's past criminal record. In any case, it is difficult to believe that prejudice resulted from a recommendation which was not followed. *State v. Hicks*, 530 S.W.2d 396, 400 [8] (Mo.App.1975).

We conclude that the trial court's finding on the issue of prosecutorial bias was not clearly erroneous.

Affirmed.

All concur.