**STATE of Missouri, Respondent,**

v.

**Deadrick ROCKETT, Appellant.**

**No. WD 59975.**

Missouri Court of Appeals,
Western District.

Oct. 29, 2002.

400

Craig A. Johnston, Assistant State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, VICTOR C. HOWARD, Judge and LISA WHITE HARDWICK, Judge.

JOSEPH M. ELLIS, Chief Judge.

Deadrick Rockett (Appellant) appeals from his convictions by jury of one count of forcible rape, § 566.030;[1] three counts of forcible sodomy, § 566.060; one count of burglary in the first degree, § 569.160; one count of robbery in the second degree, § 569.030; one count of kidnapping, § 565.110; and one count of sexual

---

1. All statutory references are to RSMo Cumm. Supp.1998 unless otherwise noted.

abuse, § 566.100. Appellant argues that the evidence was insufficient to support his convictions because the State failed to sufficiently establish his identity as the perpetrator of the charged crimes. Appellant also claims that the evidence was only sufficient to support convictions on two counts of forcible sodomy and that the evidence did not support a finding of the existence of an aggravating factor on the sexual abuse count. The facts, viewed in the light most favorable to the verdicts, are set forth below.

On June 16, 1999, V.F. was staying in Room 1718 at the Marriott Hotel in Kansas City, Missouri, while she was in town to attend a work-related conference. At approximately 9:00 p.m., an emergency alarm went off in the hotel. In response to the alarm, V.F. left her room, went down the stairs, and exited the hotel. Shortly thereafter, the hotel occupants were informed that they could return to their rooms. V.F. went back inside the hotel and boarded an elevator.

When V.F. exited the elevator on the seventeenth floor, two men that had been standing next to her on the elevator also got out of the elevator and began following her down the hall. The men were both black and about five feet seven inches to five feet, eight inches in height. Uncomfortable with being followed, V.F. allowed the men to pass her and proceed down the hall in front of her.

When V.F. reached her room, unlocked the door and started to open it, she heard one of the men say, "Get her." At that point, one of the men tackled V.F. and pinned her arms to her side while the other man finished opening her hotel room door. V.F. yelled and tried to escape, but the men held her down, covered her mouth, and threatened to kill her if she did not "shut up." The men then dragged V.F. into her room on her stomach, hold-ing her head down so she could not look at them.

Once inside the room, the men blindfolded V.F., gagged her, and bound her hands and feet with torn-up bed sheets. The men asked V.F. how much money she had, and she told them that she had about $200.00 in her purse. The men untied V.F.'s hands to get the backpack-style purse she was wearing off of her back and then retied her hands.

After taking the purse and dividing the money, one of the men turned V.F. over on her back and dragged her across the room while the other man untied her legs and took off her jeans. The two men then discussed the fact that they only had one "rubber," and the first man told the second man to look for something plastic in the bathroom to use. The first man then vaginally penetrated V.F. with his penis and began raping her.

The first man then rolled V.F. over and attempted to penetrate her anally with his penis but experienced some difficulty. The first man asked V.F. if she had any Vaseline, and she said no. At that point, the second man told the first man to "spit on the bitch." In response, the first man spit on V.F.'s anus and licked it. He then successfully penetrated V.F.

While the first man was sodomizing V.F., the second man knelt by her head and started stroking her hair. When V.F. started praying, the second man hit her and told her to "stop it." Subsequently, whenever she made any noise, one of the men would hit V.F.

After the first man finished sodomizing V.F., the two men dragged her onto the bed, and the second man then penetrated V.F.'s anus with his penis and began sodomizing her.

Subsequently, the two men moved V.F. across the room and bent her over the

desk. At that point, one of the men again penetrated her anally.

Eventually, the men put V.F. on the ground, bound her legs, and tightened all of her other bindings. They then obtained a wet washcloth or towel and attempted to clean V.F.'s vagina and anus. One of the men then tried to take V.F.'s wedding ring off but was unsuccessful.

One of the men then stated that they had been there too long and needed to leave. The men placed V.F. next to the bed and pulled the mattress on top of her. One of the men told V.F. that he was seventeen and had already killed two people. He told her not to move and that he would be back in five minutes to kill her if she had done so.

V.F. then heard the door click. After lying still for a while, she heard the door click again.

Eventually, V.F. managed to free herself and ran to lock the door. V.F. then noticed that the phones had been pulled out of the walls. After putting on her jeans, at approximately 9:45 p.m., V.F. knocked on the door to a neighboring room, and the people inside let her in and called hotel security.

Officer Jeffery Duer of the Kansas City, Missouri, Police Department, who was working for Marriott security while he was off duty, arrived a short time later. He secured room 1718 and interviewed V.F. Officer Duer then contacted the department to have crime scene investigators and sex crime detectives sent over, and they arrived a short time later. In the course of collecting evidence, investigators discovered blood spots on the wall and on V.F.'s purse, torn sheets, and three pieces of a condom package. They also recovered a used condom that was found floating in the toilet.

V.F. was taken by ambulance to St. Luke's Hospital where she was examined by a sexual assault nurse-examiner. During that examination, rectal and vaginal swabs were taken, and hair samples were collected. The exam revealed that V.F. had sustained multiple bruises and abrasions all over her body. The bruising, swelling and lacerations in her pelvic and rectal areas were so severe that they required examination and treatment by a doctor.

After being examined at the hospital, V.F. was taken back to the hotel to collect her belongings. After Officer Duer escorted her back to her room and unlocked the door for her, V.F. discovered that a diamond ring, a camera, a small clock, and her cellular phone were missing. In the course of searching for the missing items, V.F. asked Officer Duer to move the bedspread. When the bedspread was moved, Officer Duer noticed a wet towel, a T.V. Guide and a condom wrapper that fell out of the bedspread. Officer Duer contacted the crime scene investigation unit and asked them to return to collect those items.

Subsequently, detectives used phone records to trace V.F.'s cellular phone to Byron Green. The detectives did not consider Mr. Green a suspect because he was six feet, five inches tall. When questioned about the phone, Mr. Green told the detectives that he had been given the phone by Stacey Shelton when they had both been inmates at the Kansas City Community Release Center.

Subsequently, the police obtained Mr. Shelton's personal address book and determined that numerous calls made on the cellular phone after it was stolen matched up with entries in Mr. Shelton's address book. Blood and hair samples were obtained from Mr. Shelton. Forensic testing established that Shelton was the source of genetic material found in seminal fluid obtained through the rectal swab and on a

piece of gum found in the sheets used to bind V.F.

In September 1999, detectives received a tip that Appellant had been involved in the rape. Detectives determined that Shelton and Appellant were both residents of the Kansas City Community Release Center at the time of the attack on V.F. The detectives had the fingerprint identification unit compare Appellant's fingerprints with those found at the scene, and a fingerprint examiner determined that the fingerprint taken from the condom box matched Appellant's right index finger. After receiving those results, detectives obtained a court order to obtain blood and hair samples from Appellant. A pubic hair recovered from the wet towel found at the scene was later determined to be indistinguishable from Appellant's, however, no DNA testing could be performed on the pubic hair because it had been separated from the root. DNA testing later revealed that Appellant's DNA was consistent with that found in the condom found at the scene.

On December 17, 1999, the State charged Appellant by indictment with one count of forcible rape, § 566.030; three counts of forcible sodomy, § 566.060; one count of burglary in the first degree, § 569.160; one count of robbery in the second degree, § 569.030; one count of kidnapping, § 565.110; and one count of sexual abuse, § 566.100. The State subsequently filed an information in lieu of indictment charging Appellant with those same crimes as a prior offender.

Appellant was tried by jury beginning on January 29, 2001. On February 2, 2001, the jury returned its verdicts finding Appellant guilty as charged on all counts.

On April 27, 2001, the trial court sentenced Appellant as a prior offender to fifteen years in the Missouri Department of Corrections on each of the burglary, robbery, kidnapping and sexual abuse counts and to life imprisonment on the forcible rape count and each of the three counts of forcible sodomy. The trial court determined that Appellant's sentences on the three counts of forcible sodomy should be served concurrently and that all of the other sentences should be served consecutively. Appellant brings three points on appeal.

■ In his first point, Appellant contends that the evidence was insufficient to support his conviction because the State failed to sufficiently establish his identity as the perpetrator of the charged crimes. Appellant argues that the DNA testing and the hair comparison did not establish his identity to a scientific certainty. He further contends that his fingerprint could not establish his guilt because it was found on a moveable object that he had testified to having given to Mr. Shelton prior to the date of the attack.

When reviewing the sufficiency of the evidence to support a conviction, "[o]ur review is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Baker*, 23 S.W.3d 702, 709 (Mo. App. E.D.2000). In making this determination, we view all of the evidence and any reasonable inferences drawn therefrom in the light most favorable to the verdict and disregard all evidence and inferences to the contrary. *State v. Robinett*, 63 S.W.3d 236, 239 (Mo.App. W.D.2001).

■ Appellant contends that the State failed to prove beyond a reasonable doubt that he was the individual that committed the charged crimes. Certainly, in a criminal case, "the State has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime." *Id.* The evidence presented at

trial must establish that the defendant was the person who committed the charged crime. *Baker*, 23 S.W.3d at 708.

Appellant contends that the fingerprint on the condom box, the hair comparison and the DNA test results were insufficient to establish his identity. He argues that none of these pieces of evidence was entitled to much, if any, weight and that, when considered together, they could not have established his identity as the rapist beyond a reasonable doubt.

He argues that, because the forensic expert conducting the hair sample comparison and DNA analysis did not conclude that they established a positive identification to a scientific certainty, those tests were not entitled to any weight and could not sufficiently tie him to the crimes. In addition, he claims that, because his fingerprint was found on a moveable object, the State needed to prove that the fingerprint was placed on the box at the scene of the crime rather than at an earlier date for that evidence to carry any weight.

With regard to the hair comparison and DNA analysis, senior criminologist Linda Netzel of the Kansas City, Missouri, Police Department testified that she examined the pubic hair found in the wet towel and found that it was indistinguishable from the pubic hair sample taken from Appellant. However, she did testify that a positive identification could not be made from the pubic hair found in the towel because the root, from which a DNA sample could be obtained, was missing.

From the condom, Ms. Netzel was able to obtain a sample from which a genetic profile was consistent with a mixture of fluids from Appellant and V.F. Ms. Netzel clearly discerned Appellant's DNA profile at eight of thirteen loci. Ms. Netzel testified that the remaining five loci matched Appellant's profile but that those matches were deemed inconclusive because of potentially shared genetic information between Appellant and V.F. at those loci. Ms. Netzel testified that, if you took DNA from V.F. and from Appellant and intentionally mixed it together, these were the results that you would expect to find. Ms. Netzel stated that the statistical frequency with which a match to Appellant's DNA profile at eight of the thirteen loci would occur was in one in 900 million individuals.

Ms. Netzel testified that she could state to a degree of scientific certainty the frequency in which similar results would occur, but that, under the standards established by the lab, she could not state that it was a positive identification. Ms. Netzel indicated that the standard applied by the FBI to establish a positive DNA identification is based upon the population of the United States, and therefore, under the FBI standard, a positive identification is established if the DNA test results would occur in one in 280 million people. Ms. Netzel testified that her lab had decided to use a more stringent level than the FBI for establishing a positive identification and won't declare a DNA test result to have rendered a positive identification unless the DNA test results would occur in one in 5.9 trillion people.[2]

Appellant makes much ado of Ms. Netzel's unwillingness to declare either the DNA test results or the hair analysis to have rendered a "positive identification." Appellant concludes that the lack of a declaration of a positive identification rendered this evidence meaningless as far as identifying him as the perpetrator.

---

**2.** Ms. Netzel testified that the current world population was approximately six billion people.

■ Appellant's unsupported assertions to the contrary aside, the jury was clearly entitled to afford both the DNA test results and the hair sample analysis significant weight in determining Appellant's identity as one of the rapists, regardless of whether they resulted in a positive identification to a scientific certainty. *See State v. Hoff,* 904 S.W.2d 56, 59 (Mo.App. S.D.1995) (noting a pubic hair sample match and a DNA match shared by at least 9.2% of the Caucasian population as evidence going toward establishing the defendant's identity as the rapist). The weight to be afforded this evidence was within the province of the jury to decide. *Robinett,* 63 S.W.3d at 241. The DNA testing indicated that a similar match would only occur with a statistical frequency of one out of every 900 million people, over three times the level of statistical probability applied by the FBI in determining a positive identification. The jury could properly have considered the DNA test results to be substantial evidence of Appellant's identity as one of V.F.'s attackers and assigned it significant weight in that regard.

Similarly, the jury was entitled to assign the pubic hair comparison substantive weight. The fact that the pubic hair found in the wet towel was indistinguishable from Appellant's pubic hair sample, while not a conclusive identification, provides further substantive evidence that Appellant committed the crime.

Appellant also claims that fingerprint found on the condom box was not entitled to any weight. Appellant contends that the State bore the burden of proving that his fingerprint was placed on that moveable object during the course of the attack

on V.F. Appellant cites to a handful of cases from other jurisdictions in support of this position.[3]

■ This Court has previously held that the question of when a fingerprint was placed upon a moveable object and the weight to be given such evidence is a jury question. *State v. Woodworth,* 941 S.W.2d 679, 684 (Mo.App. W.D.1997). Where there is a reasonable, non-incriminatory explanation why a defendant's fingerprints were present on a piece of evidence, it creates a question for the jury regarding whether to believe the defendant's explanation or whether the presence of a clear print on the item indicated that the defendant touched the item at the time of the crime. *Id.* at 689. " '[T]he mere existence of other possible hypotheses is not enough to remove the case from the jury.' " *Id.* (quoting *State v. Nash,* 621 S.W.2d 319, 323 (Mo.App. W.D.1981)).

■ The jury could reasonably have determined that Appellant's testimony that he had given the condom box to Mr. Shelton days prior to the attack on V.F. was not credible. "Credibility of witnesses and the weight and value to be given their testimony are matters within the province of the finder of fact and are not for review on appeal." *Robinett,* 63 S.W.3d at 241. It was up to the jury to determine whether they believed that Appellant had put his fingerprint on the condom box on an innocent occasion or at the time of the attack on V.F. *Woodworth,* 941 S.W.2d at 689.

Accordingly, the DNA test results, the hair comparison, and the fingerprint evidence all constituted competent evidence that could be considered in determining whether Appellant was one of V.F.'s at-

---

**3.** Appellant cites to *State v. Gilmore,* 142 N.C.App. 465, 542 S.E.2d 694, 697–98 (2001); *Blevins v. State,* 6 S.W.3d 566 (Tex.App.1999); *Commonwealth v. Morris,* 422 Mass. 254, 662 N.E.2d 683, 685–86 (1996); and *State v. Bridge,* 91 Wash.App. 98, 955 P.2d 418, 419 (1998).

tackers. When considered together and viewed in accordance with our standard of review, that evidence clearly constituted more than enough evidence for the jury to reasonably have determined beyond a reasonable doubt that Appellant was the individual that committed the charged crimes. Point denied.

■ In his second point, Appellant claims that the trial court erred in allowing him to be convicted of three counts of forcible sodomy rather than two because the evidence only established two instances of sodomy. Appellant argues the act of sodomy occurring on the bed and the act of sodomy occurring at the desk should have been considered a single, continuing course of conduct and not a separate crime. Appellant also makes a claim of plain error asserting that his conviction for three counts of sodomy violated the Double Jeopardy clause of the Fifth and Fourteenth Amendments to the United States Constitution because of the lack of sufficient evidence to establish three acts of sodomy.

As noted *supra*, when reviewing the sufficiency of the evidence to support a conviction, "[o]ur review is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Baker*, 23 S.W.3d at 709. In making this determination, we view all of the evidence and any reasonable inferences drawn therefrom in the light most favorable to the verdict and disregard all evidence and inferences to the contrary. *Robinett*, 63 S.W.3d at 239.

Appellant concedes that, under the case law, each sexual act generally constitutes a distinct and separate offense. *See State v. Childs*, 684 S.W.2d 508, 511 (Mo.App. E.D. 1984); *State v. Dennis*, 537 S.W.2d 652, 654 (Mo.App. W.D.1976). As noted in *Childs:*

Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder,—an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and further danger to the victim.

684 S.W.2d at 512 (quoting *Vaughan v. State*, 614 S.W.2d 718, 722–23 (Mo.App. W.D.1981)).

Appellant argues that the evidence established that the sodomy occurring on the desk was merely a continuation of the sodomy occurring on the bed and did not constitute a separate and distinct act. In making this assertion, Appellant relies on V.F.'s testimony that, after she was sodomized on the bed, "[t]hen they moved me to the desk and stood me by the desk and kind of bent me over the desk and continued to anally rape me there." Appellant argues that V.F.'s statement that they "continued to anally rape" her establishes that it was one continuous course of conduct and that the individual sodomizing her on the bed simply continued to do so as they crossed the room and got onto the desk. He contends that "there was no evidence that the acts were separate and distinct."

■ We must consider the facts of each case in determining whether a single sex crime or multiple sex crimes have been committed. *State v. Hamilton*, 791 S.W.2d 789, 795 (Mo.App. E.D.1990). "The fact that the two offenses occurred at the same location within a relatively short period of time does not prevent conviction of both offenses." *State v. Mudd*, 703

S.W.2d 63, 67 (Mo.App. S.D.1985). Separate convictions may be supported if the evidence sufficiently establishes that each act had an individual identity and further denigrated the victim's integrity. *Hamilton,* 791 S.W.2d at 796.

Viewed in accordance with our standard of review, the evidence reflects that the second man completed an act of anally sodomizing V.F. on the bed. V.F.'s testimony indicates that both men then forcibly took her across the room, positioned her against the desk in a calculated fashion, and one of the men then anally sodomized her again.[4] From this testimony, the jury could reasonably have found that a new act of sodomy had occurred in a new position. *See Childs,* 684 S.W.2d at 511–12 (affirming three separate rape convictions where the defendant got on top of the victim and raped her, turned her over and raped her from behind, and then climbed back on top of her and raped her again). The act of violence occurring on the desk had an individual identity and further served to denigrate V.F.'s integrity. The evidence sufficiently supports Appellant's convictions on three counts of forcible sodomy. Point denied.

■ In his final point, Appellant argues that the trial court erred in denying his motion for acquittal at the close of evidence on the aggravated sexual abuse count. Appellant contends that, while the evidence was sufficient to support a conviction for class C felony sexual abuse, the evidence was insufficient to establish any of the aggravating factors that would make his acts a class B felony.

A defendant is guilty of sexual abuse under § 566.100.1 if he uses forcible compulsion to subject another person to sexual

contact. "Sexual contact" is defined as "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, for the purpose of arousing or gratifying sexual desire of any person." § 566.010(3). "Sexual abuse is a class C felony unless in the course thereof the actor inflicts serious physical injury or displays a deadly weapon or dangerous instrument in a threatening manner or subjects the victim to sexual contact with more than one person or the victim is less than fourteen years of age, in which case the crime is a class B felony." § 566.100.2.

Appellant acknowledges the sufficiency of the evidence to support his conviction for Class C felony sexual abuse based upon the testimony related to the licking of the victim's rectum by the first man. However, Appellant argues that the evidence did not support a finding related to any of the aggravating factors found in § 566.100.2, which would make the sexual abuse a Class B felony. Appellant claims that the sexual abuse ceased when the first man began sodomizing V.F. Appellant argues that, because the second man did not touch V.F. until after that point, he cannot be deemed to have subjected her to sexual contact with more than one person in the course of the sexual abuse.

■ While each sexual act generally constitutes a distinct and separate offense, *See Childs,* 684 S.W.2d at 511, the case law reflects that, when considering whether statutory aggravating factors occurred "in the course" of an offense, it is sufficient that the aggravating factor arose during the course of a set of contemporaneous events that include the charged offense. *See State v. Badakhsan,* 721 S.W.2d 18, 21 (Mo.App. E.D.1986); *State*

---

**4.** V.F. testified that she was not sure whether the first or the second man sodomized her on the desk.

*v. Gray*, 895 S.W.2d 241, 245 (Mo.App. S.D.1995). The statutory purpose for the inclusion of the aggravating factor at issue was to increase the possible punishment in gang rape situations. *See Badakhsan*, 721 S.W.2d at 21. This aggravating factor is sufficiently established where the facts support a finding that the events were contemporaneous and the sexual abuse is "committed under circumstances such that a jury could find that [sexual abuse] by a second man was part of a common purpose or intent." *See Id.*

In this case, the record reflects that, prior to committing the act of sexual abuse, the first man told the second man to find something in the bathroom that the second man could use in place of a condom. While in the bathroom, the second man told the first man to spit on V.F.'s anus to make it easier to sodomize her. The first man then spit on V.F.'s anus, licked it, and both men then sodomized her. This evidence clearly supports a finding that events in the hotel room were contemporaneous and that the intent of the two perpetrators at the time of the sexual abuse was to subject V.F. to sexual contact with more than one person. The trial court did not err in overruling Appellant's motion for judgment of acquittal at the close of all evidence on the aggravated sexual abuse count. Point denied.

The judgment is affirmed.

All concur.