STATE of Missouri, Respondent,

v.

Cloyd Samuel RICHARDSON, Appellant.

No. 57834.

Supreme Court of Missouri,
En Banc.

Nov. 12, 1974.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Christopher Hexter and Donald L. Schmidt, Legal Aid Society of St. Louis, St. Louis, for appellant.

DONNELLY, Chief Justice.

Appellant, Cloyd S. Richardson, was convicted of murder in the first degree by a jury in the Circuit Court of the City of St. Louis, Missouri, and his punishment was assessed at death. Following rendition of judgment and imposition of sentence on March 24, 1972, an appeal was taken to this Court.

This Court does not have jurisdiction of this case under Mo.Const. Art. V, § 3, V.A.M.S. Parks v. State, 492 S.W.2d 746 (Mo.banc 1973). We retain and decide the case under authority of Mo.Const. Art. V, § 10, for the reasons stated in Foremost-McKesson, Inc., v. Davis, 488 S. W.2d 193, 196 (Mo.banc 1972), and because the death penalty was imposed.

On February 22, 1971, appellant was discharged from the Atlanta Penitentiary, and picked up by his stepson, Joseph Hardin. After spending the morning at Joseph Hardin's home, they purchased a gun. At approximately 8:00 p. m., Hardin and appellant left Atlanta to travel to St. Louis. They arrived in St. Louis at approximately 9:00 p. m. on February 23, 1971.

On February 26, 1971, at approximately 7:30 p. m., Mrs. Eugenia Pantazo, owner and operator with her husband of Pantazo's Market at 3201 Arsenal Street in the City of St. Louis, locked up the store and was driven to her home by her daughter, Katherine Pantazo. After taking her mother home, Katherine Pantazo returned to reopen and operate the Pantazo Market for her parents. Shortly after arriving at home, Mrs. Pantazo called the store to give Katherine a message. Receiving no answer after several attempts, Mrs. Pantazo asked Peter Papazianis, who was working with her husband on some cabinets at the Pantazo home, to drive her to the store. Mrs. Pantazo and Peter Papazianis arrived at the store at approximately 7:45 p. m., and found the front door half open. They entered and found the body of a man, later identified as Charles Baker, lying face down on the floor in front of a counter, and the body of Katherine Pantazo lying face up on the floor behind a counter. Peter Papazianis turned the man over and discovered that he had been shot. Eugenia Pantazo discovered her daughter, Katherine, with a hole in her head and a small amount of blood on the floor. Peter Papazianis then called the police.

Charles Baker was killed. Katherine Pantazo was seriously injured but survived.

On February 28, 1971, appellant, Joseph Hardin, Leola Richardson and her son left St. Louis and arrived in Atlanta, Georgia, on March 1, 1971.

Thereafter, Hardin placed a call to the Atlanta Police Headquarters and talked with Detective Smegal of the Homicide Division.

He testified at trial as follows:

"Q (By Mr. Allred) Tell the jury what you told Detective Smegal on the telephone.

"A I told Detective Smegal on the telephone that I knew of two people having been shot in St. Louis, the one supposed to be a security guard and the other a school teacher. So he asked me if I knew who did it, and I told him I thought I knew who did it. And he asked me my name and I gave him my name. Then I told him if he called St. Louis authorities, he could get information about what I told him. So he told me to call him back the next day."

On April 3, 1971, Hardin and appellant were arrested in Decatur, Georgia, and were placed in the DeKalb County Jail. Police officers from St. Louis arrived on April 6, 1971. On April 7, 1971, they questioned Hardin and appellant.

On April 9, 1971, the St. Louis police officers took appellant and Hardin back to St. Louis. They arrived in St. Louis at approximately 12:45 p. m., and proceeded immediately to St. Louis Police Headquarters. Appellant was interviewed at police headquarters from approximately 2:30 p. m. to 6:45 p. m. During the course of that interview, appellant made an oral statement which the police transcribed. Appellant was then taken to a TV studio in the police department where he gave a video tape confession.

In his video tape confession, appellant stated that after an argument with Joseph Hardin on the afternoon of February 26, 1971, he looked in the dresser drawer where both Hardin's pistol and the pistol purchased in Atlanta had been stored. He noticed that Hardin's pistol was missing and decided to take the other pistol. Appellant further stated that after leaving Shirley Gilmore's house in the early evening of February 26, 1971, he went to a tavern at Virginia and Arsenal. He had a couple of drinks and then decided to buy something to eat. He proceeded to a market at Compton and Arsenal. Appellant then stated that he shot a woman clerk at the market and a man who had been packing groceries.

Appellant first contends that the "trial court erred in refusing to suppress appellant's alleged video tape confession in that said confession was the product of an unlawful arrest made in violation of appellant's rights under the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 15 of the Missouri Constitution."

Appellant was arrested in Georgia for receiving stolen property. He relies primarily on the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963), wherein the Court held that statements derived immediately from an illegal arrest must be excluded.

We are of the opinion that, as in State v. Newell, 462 S.W.2d 794, 797, 798 (Mo. 1971), "we need not analyze the evidence to determine whether . . . [such arrest was an illegal] arrest. This for the reason that, assuming the illegality of the arrest, the subsequently given incriminating statements became 'so attenuated as to dissipate the taint,' within the meaning of the language used in Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). Although under Wong Sun incriminating oral statements by an accused may be so intimately connected with the circumstances of an illegal arrest as to become tainted and inadmissible in evidence, that case does not hold that 'all oral statements are the fruit of the "poisonous tree" simply because they would not have been made but for the illegal actions of the police. We think the Court in Wong Sun clearly indicates the view that a statement which is shown to have been freely and voluntarily made without coercion, either physical or psychological, may be thereby purged of any stigma of illegality and the statement is admissible.' United States v. Close, 4 Cir., 349 F.2d 841, and cases cited, l.c. 851."

The essential question, therefore, is whether, even if we should assume an "illegal arrest, the statements actually are made voluntarily without coercion." State v. Johnson, 488 S.W.2d 645, 649 (Mo. 1973).

On the record in this case, we hold that the video tape confession was made voluntarily without coercion. Appellant was arrested on April 3, 1971, in Georgia. The confession was made on April 9, 1971, in St. Louis. He was given Miranda warnings on three occasions in Georgia and on two occasions in St. Louis. The State's evidence, to the effect he was not coerced, is not disputed. In fact, at a special hear-

ing ordered by this Court and held on August 27, 1973, appellant testified as follows:

"Q Is there anything that occurred that influenced you to make this statement?

"A Well, just the fact that I had to get Joe [Hardin] out of there some way. I didn't think he would be able to make it."

Appellant next contends that the "trial court erred in denying appellant's request for a mistrial, in that the testimony of Katherine Pantazo had little or no relevancy, was designed to and did in fact inflame and prejudice the jury, and amounted to impermissible evidence of a crime separate and distinct from the one with which appellant was charged."

On the record before us concerning the appearance of Katherine Pantazo at trial, we have concluded that appellant's contentions are without merit. It is apparent that her progress to the witness stand, with the assistance of canes and two men, was laborious. In addition, she was unable to identify appellant as the person who shot her. However, we believe and hold: (1) that her presence and testimony was relevant for the purpose of dispelling the inference that could have been drawn from her absence that her testimony would have been unfavorable to the State (Cf. State v. Topalovacki, 213 S.W. 104, 105 (Mo. 1919)); (2) that the question of prejudice was within the discretion of the trial court and that there was no abuse of discretion (Cf. State v. Brown, 443 S.W.2d 805 (Mo. banc 1969)); and (3) that evidence of the shooting of Katherine Pantazo was competent to prove motive, intent, and the absence of mistake or accident, and was therefore admissible (State v. Reese, 364 Mo. 1221, 1226, 274 S.W.2d 304, 307 (Mo. banc 1955)).

Appellant finally contends that the "trial court erred in allowing the prosecuting attorney to cross-examine appellant about alleged admissions made in letters appellant had written while in City Jail."

This contention involves an episode at trial during cross-examination of appellant by counsel for the State. The State had attempted to introduce certain letters into evidence and they were excluded by the trial court. The following then transpired:

"Q (By Mr. Allred) Have you ever told anyone that you knew, when you made your oral confession, that you were putting your life on the line?

"A I have since then; yes.

"Q Since the time you made the confession?

"A Yes.

"Q Have you ever told anyone that the only evidence that the State had so far was what Joe Hardin had told them?

"A Sure.

"Q Have you ever told anyone, 'Don't forget, when you see my lawyers, that you don't believe that I did it'?

"MR. BIGLER: Objection. There is no identification of time or place on that, Your Honor.

"THE COURT: It will be overruled.

"MR. ALLRED: You may answer.

"A If that's mine, yeah, I probably did.

"Q (By Mr. Allred) Told them, 'Don't forget to tell the lawyers that they don't believe you are guilty'?

"A Right.

"Q Have you ever told anyone—

"MR. BIGLER: Just a minute. Your Honor—

"Q (By Allred continuing)—that you had your clothes—

"MR. BIGLER: Excuse me, Your Honor. I think he is trying to do indirectly what he was not permitted to do

directly before on my motion. He is now going into these very documents that—

"MR. ALLRED: I didn't ask him anything about documents.

"THE COURT: Overruled. You may answer.

"MR. ALLRED: You may answer, Mr. Richardson:

"Q Have you ever told anyone that on February 26th you had your clothes on and were home fifteen minutes before you heard any sirens?

"A Right.

"MR. BIGLER: What was the answer to that?

"THE WITNESS: 'Yes.'

"Q (By Mr. Allred) Have you ever told anyone that you pray to God that he will forgive you every night?

"A Forgive me?

"Q That's right. A Sure, I do that every night.

"Q Have you ever told anyone that if you had thought when you made your confession that Joe was the one that had turned you in, that you would still be in jail with him?

"A Exactly right.

"Q Have you ever told anyone when they write you, to not put anything in any letters that could hurt your case in court?

"A Right.

"MR. ALLRED: I am going to close my cross-examination.

"THE COURT: All right.

"MR. BIGLER: No further questions.

"THE COURT: You may step down.

"MR. BIGLER: That's the defendant's case, Your Honor.

"MR. ALLRED: The State is prepared to offer rebuttal evidence, Your Honor.

"THE COURT: All right, let's proceed.

"(The following proceedings took place at the bench without the hearing of the jury:

"MR. BIRD: I would like to make a motion for a mistrial on behalf of the defendant, for the reason that after we objected to use being made of the alleged letters that were written by Sam, the defendant in this case, the Court sustained our objection under the rule that any use of these letters would be improper, since we had not been furnished copies of them. Counsel returned directly to the courtroom and used each and every one of those letters he had intended to use in the first place and read excerpts from them, and/or summaries of those, and asked the very same questions he intended to ask in the first place in direct disobedience of the Court's ruling; and for that reason and for the reason we alleged these letters were inadmissible in the first place and for the reason that counsel violated that ruling, we ask for a mistrial.

"THE COURT: Mr. Allred, what do you say with regard to the use of the information that was in the letters?

"MR. ALLRED: I used notes that I made, Your Honor. I did not use those letters; did not use the letters, no.

"THE COURT: I will deny the motion for a mistrial.)"

 In State v. Coleman, 186 Mo. 151, 160, 84 S.W. 978, 980 (1905), this Court, in discussing whether a judgment should be reversed, said: "Certainly this could not be done unless the error was prejudicial to defendant, and, while the presumption is that an error made against a defendant when on trial for crime is prejudicial, this presumption may be overcome by the facts and circumstances in ev-

idence, if sufficient, and we can but conclude from the facts disclosed by the record that the error was not prejudicial." The nature and extent of the cross-examination of appellant was discretionary with the trial court and we are unable to say upon the record in this case that the trial court abused its discretion. Cf. State v. Flinn, 96 S.W.2d 506, 512 (Mo.1936). We find no prejudicial error.

We are of the opinion that there was no reversible error in the trial of the issues relating to appellant's guilt. However, the punishment assessed must be reduced to imprisonment for life. State v. Cuckovich, 485 S.W.2d 16 (Mo.banc 1972).

It is ordered that the Clerk of this Court forthwith furnish the Warden of the State Penitentiary and the State Department of Corrections with certified copies of this order and judgment.

As so modified, the judgment is affirmed.

All concur.