**STATE of Missouri, Respondent,**

v.

**Bernard JACKSON, Appellant.**

**No. WD 74431.**

Missouri Court of Appeals,
Western District.

June 11, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 30, 2013.

Application for Transfer Denied Oct. 29, 2013.

208

Richard A. Starnes, Jefferson City, MO, for respondent.

Rosemary E. Percival, Kansas City, MO, for appellant.

Before Division One: GARY D. WITT, Presiding Judge, THOMAS H. NEWTON, Judge and MARK D. PFEIFFER, Judge.

GARY D. WITT, Judge.

In 1983 and 1984, four single women, all living in the Waldo/Armour Hills area of Kansas City, were attacked in their homes in the late evening and early morning hours. All four were blind-folded, robbed, sodomized, and repeatedly raped. In each case, after the assailant fled and the attack ended, the victim went to a hospital and underwent a "rape kit" examination, which included the collection of samples for use in DNA analysis. In several cases addi-

tional DNA evidence, fingerprints and hair samples were recovered from the scene of the crimes. The crimes remained unsolved for more than twenty-five years. In 2010, a "cold case" squad again reviewed the files and ran the samples using more advanced DNA technology. The DNA analyses matched the biological samples of Bernard Jackson ("Jackson") located in the Missouri State Highway Patrol DNA database.[1] In 2010, a grand jury indicted Jackson, and he was charged with four counts of robbery in the first degree, seven counts of forcible rape, and seven counts of sodomy, against the four victims. Following trial in the Circuit Court of Jackson County, a jury convicted Jackson of all counts. The trial court found Jackson to be a prior and persistent sexual felony offender and sentenced Jackson to a life term for each of the eighteen counts with each of the eighteen life terms to run consecutively. Jackson timely appeals.

On appeal, Jackson argues that the trial court erred in (1) overruling his motion for judgment of acquittal on various counts because the evidence was insufficient to support the jury's finding that Jackson displayed a deadly weapon or dangerous instrument during the commission of the crimes; (2) accepting the jury's verdicts and sentencing Jackson on six of the counts on the offenses against victims K.M. and J.B., because the charges represent multiple punishments for the same offense in that the separate multiple allegations as to each victim were part of the "continuing course" of one crime and not separate offenses, resulting in double jeopardy; (3) overruling Jackson's *Batson*[2]

1. The creation of this database was first passed into law in 1991. Its usage is governed by section 650.055.

2. *Batson v. Kentucky* established a burden-shifting procedure for ensuring that minority venire members are not discriminated against

on the basis of race through the State's use of peremptory challenges. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

challenges to the State's use of peremptory strikes to remove three African–Americans from the venire panel; and (4) overruling Jackson's objections to testimony concerning the impact that the crimes had on the victims' lives offered during the guilt/innocence phase of the trial. For reasons explained below, we affirm.

### Factual Background [3]

■ In 1983 and 1984, Jackson lived and worked in Kansas City, residing at 1315 E. 59th Terrace. The residence was within 3.5 miles of the residences of four single women who were robbed and raped during that time frame. All of the women were in their late 20s or early 30s and lived in the Waldo/Armour Hills area of midtown Kansas City.

### A. July 30, 1983 (Victim K.W.) [4]

It was a hot day, so K.W., a 29–year-old woman who lived alone, went to bed with her windows open. Around 2:00 a.m., K.W. awoke to see a man crawling on her bedroom floor. She screamed and the man jumped on her and covered her mouth. He told her that he had a gun and could kill her. He then told her to turn over and not look at him. He tied her hands behind her back with pantyhose, blindfolded her with socks and put a sock in her mouth. He then rummaged through her room looking for things to steal. He next led K.W. to the kitchen, went outside, and then returned. He then led K.W. back to the bedroom where he pushed her onto the bed and raped her. He then went to the bathroom, went outside again then returned to the bedroom. There he fondled K.W.'s breasts, put his fingers in her vagina while she stood, then pushed her onto the bed and raped her again. The man then asked if she wanted him to leave and she replied "yes." He took $35 and jewelry. K.W. called her best friend who called the police for her. K.W. went to the hospital and submitted to a rape examination. K.W. described her assailant as a black man, about six feet tall, with a medium build and about 25 to 35 years old.

### B. October 30, 1983 (Victim K.M.)

Shortly after midnight on the evening of October 29, 1983, K.M. came home and went to bed. K.M. was 29 years old and lived alone. She awoke to see the silhouette of a man standing in her doorway. She initially thought it was her ex-boyfriend. After she spoke, within seconds, the man was at her bed holding an object to the back of her neck. It was round, metallic, and felt like a gun. The man said it was a gun and that he would kill her if she told anyone. The man blindfolded her, tied her hands together with scarves, and walked her through the house checking to see if anyone else was there.

He took $16 from her purse and rummaged through her drawers and jewelry. He then moved K.M. to the living room and pushed her onto the couch. He put his hand and then his mouth on her vagina. K.M. tried to deter him by talking to him and holding her legs together but he slapped her, called her a "bitch," threatened to kill her, told her not to talk, and gagged her. He then partially penetrated her vagina with his penis. Because she was resisting, he moved her to the floor,

---

**3.** We view the facts in the light most favorable to the jury's verdict. *State v. Rinehart,* 383 S.W.3d 95, 98 n. 3 (Mo.App. W.D.2012). The only fact disputed by Jackson with regard to these crimes is whether the attacker used a gun during their commission. The majority of the factual background here was adopted from Jackson's brief.

**4.** Pursuant to section 566.226, we refer to the victims by initials to protect their identity.

placed a pillow under her hips and then penetrated her again, this time fully. The man then took her back to the bedroom and left her on the bed. After she was sure he was gone, K.M. called the police and went to the hospital where she submitted to a rape examination. K.M. described her attacker as about 5′10″ to 6′ tall and weighing about 170 lbs. She described him as black based on the feel of his hair, and as being in his 20s based on the sound of his voice.

## C. December 26, 1983 (Victim J.B.)

J.B. was 31 years old and lived alone. On December 26, 1983, she came home around 10:30 p.m. She saw a light on in her bedroom and did not recall leaving it on. She unlocked her front door, went inside, and as she turned to close the door, a black man jumped out from behind the door. He turned J.B. around and told her not to look at him, warning her that he had a gun. J.B. felt something cold and circular on her cheek and assumed it was a gun. The man led her to the bedroom where he tied her hands with pantyhose and blindfolded her with socks. He then took off J.B.'s sweatshirt and fondled her. J.B. said she had asthma and needed her inhaler so he walked her to the bathroom to get it. At one point, as J.B.'s hands were turning blue, the man removed the restraints. He undressed J.B., sat her on the bed but then told her to get under the covers since the house was very cold. The man undressed partially and got in bed with her.

The man then touched J.B.'s vagina with his hand, then with his mouth. He asked J.B. what she liked to do in bed. He also asked about birth control and then told J.B. to insert her diaphragm. Several times he got out of bed and rummaged about. After getting upset that J.B. was not sexually responding to his sodomy acts, he asked for baby oil which he put on his hands and then touched J.B.'s vagina again. Next he applied the oil to his penis and then partially penetrated J.B. with his penis. He then left the bed and looked for Vaseline, found some, applied it to his penis but again was only able to partially penetrate J.B.'s vagina. On his third attempt, he again only partially penetrated her. Finally, he positioned a pillow under J.B.'s hips and tried to penetrate her for a fourth time, this time penetrating fully. After this, he told J.B. to remove her diaphragm which he took to the bathroom and she heard the toilet flush. He then tied her to the bedposts using shoelaces and asked about things of value that he could steal. He took a television, a phone, and a vacuum cleaner. After about twenty minutes, J.B. ceased hearing the man. She then chewed through the shoelaces that he had used to tie her. She called the police and went to the hospital where she underwent a rape examination. She reported to the police that the man had held a round, hard object against her cheek, saying he had a gun and would kill her if she moved. J.B. testified that she thought it was a gun. J.B. described the assailant as black, in his 20s, with short black hair and a slight build.

## D. February 11, 1984 (Victim B.G.)

On February 10, 1984, B.G. came home around midnight. She was 32 years old and lived alone. As B.G. entered the house, she was grabbed from behind and her eyes were covered. A man said he had a gun and would hurt her unless she cooperated. He put something hard and pointed against her temple and B.G. assumed it was a gun. The man led B.G. to her bedroom where he used scarves to blindfold her, gag her and tie her hands behind her back. He then took her pants off, asked her what she liked sexually, and put his hand on her vagina. He then

penetrated her with his penis. Afterwards, the man wandered around her house. After about twenty minutes, she did not hear any more sounds so she began trying to get her hands loose. When she finally freed herself, she called the police and her boyfriend. The man had taken her television, $3.00, and an insurance check. B.G. went to the hospital, where a rape examination was performed. B.G. described the man as black based on his voice.

### E. April, 1984

In April 1984, a police officer stopped Jackson's car for expired plates. Jackson was a black male, weighing 145 pounds, age 26, with black hair and brown eyes. He lived at 1315 E. 59th Terrace in Kansas City which was 3.1 miles from K.W.'s house, 1.7 miles from K.M.'s house, 3.5 miles from J.B.'s house and 3 miles from B.G.'s house.

### F. April, 2010

In April 2010, members of the "cold case" squad with the KCPD reviewed files from the 1980s and noticed a pattern among the rape cases. They requested a reexamination of the evidence. In May 2010, a DNA analyst re-examined the evidence using more current DNA analysis and obtained buccal swabs from the victims. After obtaining a full male DNA profile from the rape kit from K.W., the analyst entered it into the Missouri State Highway Patrol's DNA database. The DNA profile matched Jackson's, which was in the database.

Jackson was arrested on May 5, 2010, and a buccal swab was taken from him. Jackson's DNA profile from the buccal swab also matched the male profile of K.W.'s vaginal swab, a semen stain on a patch of K.W.'s bedsheet that had been preserved, and a hair profile from a hair recovered from that crime scene. The statistical chances of the semen and hair matches examined in this case were 1 in 143 quadrillion and 1 in 180 billion, respectively. Jackson's DNA profile was also matched to the DNA profile recovered from the rape kits from K.M., J.B. and B.G. A fingerprint analysis from a print taken from B.G.'s kitchen also matched Jackson's right thumb.

Further relevant facts are set forth below as necessary.

On May 28, 2010, a grand jury indicted Jackson on four counts of robbery in the first degree, seven counts of sodomy involving the use of a weapon, and seven counts of rape involving the use of a weapon. A trial took place in the Circuit Court of Jackson County from July 11–15, 2011. The jury convicted Jackson on all counts. On September 30, 2011, the sentencing hearing took place. One victim, K.M., testified and both sides' counsel offered statements at the sentencing hearing. Jackson himself did not testify. Having previously found Jackson to be a prior and persistent sexual offender, the trial court entered judgment and sentenced Jackson to eighteen consecutive life terms.

On appeal, Jackson argues that the trial court erred in (1) overruling his motion for judgment of acquittal on various counts because the evidence was insufficient to support the jury's finding that Jackson displayed a deadly weapon or dangerous instrument during the commission of the crimes; (2) accepting the jury's verdicts and sentencing Jackson on six of the counts for the offenses against victims K.M. and J.B., because the charges represent multiple punishments for the same offense in that the separate multiple allegations as to each victim were part of the "continuing course" of one crime and not separate offenses, resulting in double jeopardy; (3) overruling Jackson's *Batson*

challenges to the State's use of peremptory strikes to remove three African–Americans from the venire panel; and (4) in overruling Jackson's objections to testimony concerning the impact that the crimes had on the victims' lives offered during the guilt phase of the trial. For reasons explained below, we affirm.

## I.

In Point One, Jackson challenges the sufficiency of the evidence to convict him of displaying a deadly weapon or dangerous instrument during the commission of the crimes because none of the victims ever saw a gun. Jackson alleges that section 566.030 [5] requires that the defendant "display" a gun or dangerous instrument and that the State failed to present evidence that any of the victims ever saw a gun "displayed."

### Standard of Review

■ "This Court's review of a claim of insufficient evidence is limited to determining whether the evidence is sufficient to persuade any reasonable juror as to the element of a crime beyond a reasonable doubt." *State v. Ford*, 367 S.W.3d 163, 166 (Mo.App. W.D.2012) (citation omitted). "In making this determination, 'we accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary.'" *Id.* (internal citation omitted).

■ "This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt." *State ·v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012) (internal citation and quotation marks omitted). This court does not act as a "super juror" with veto powers, but instead, gives great deference to the factual findings of the trier of fact. *Id.* (citation omitted).

### Analysis on Point I

■ Jackson contends that since none of the victims ever saw a gun displayed, the State thus failed to present sufficient evidence for a conviction of forcible rape while displaying a deadly weapon, which makes the court's judgment and sentencing erroneous. As Jackson points out, due process requires that, in order to convict a person of a crime, the State is required to prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 314–15, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In this respect, he contends that the State did not prove, beyond a reasonable doubt, that, in the course of raping, sodomizing and robbing the victims, he "displayed a deadly weapon or dangerous instrument in a threatening manner" as charged, and thus, there was no evidence that he actually possessed a gun.

Section 566.030 (RSMo Supp.1982 and RSMo Supp.1983) states as follows:

566.030.1 A person commits the crime of forcible rape if he has sexual intercourse with another person to whom he is not married, without that person's consent by the use of forcible compulsion.

---

5. Based on the date of the offenses, most statutory references are to RSMo 1978 cumulative and as supplemented by RSMo 1982 Supp., which was in effect from August 13, 1982 until September 27, 1983 and by RSMo 1983 Supp., which was in effect from September 28, 1983 until August 12, 1984. If a date is not indicated following a statutory reference, then reference is to RSMo 2000 as supplemented.

566.030.2 Forcible rape or an attempt to commit forcible rape as described in subsection 1 of this section is a felony for which the authorized term of imprisonment, including both prison and conditional terms, is life imprisonment or a term of years not less than five years, unless in the course thereof the actor inflicts serious physical injury on any person, *displays a deadly weapon or dangerous instrument in a threatening manner* or subjects the victim to sexual intercourse or deviate sexual intercourse with more than one person, in which cases forcible rape or an attempt to commit forcible rape is a class A felony.

(Emphasis added).

### A. Gun Displayed and Perceived by Victims

Contrary to Jackson's contentions, the evidence supports the jury's finding that Jackson displayed a gun during the commission of the crimes. At trial, three of the four victims testified that they felt a cold, hard, round metal object placed against their bodies—K.M. at the back of her neck, J.B. against her cheek and B.G. at her temple.[6] Each instance occurred after Jackson told them to turn away and not face him while he blindfolded them. Further, all four victims testified that Jackson told them he had a gun and threatened to use it on them. The jury was entitled to believe Jackson's out-of-court statements. *State v. Taylor,* 373 S.W.3d 513, 520 (Mo.App. E.D.2012). This court has previously determined that the *threat* of the use of a gun alone is enough for a jury to reasonably believe that the defendant possessed a gun. *Lewis v. State,* 24 S.W.3d 140, 144 (Mo.App. W.D. 2000). Although *Lewis* involved whether a defendant could be charged with armed robbery despite a gun not being seen by the victim, we find its analysis persuasive.

In *Lewis,* the defendant entered a gas station and said to the cashier "This is a robbery. Don't do anything stupid. Don't make me shoot you." *Lewis,* 24 S.W.3d at 143. He then demanded money and told her to hurry up as he reached underneath his sweater, saying "hurry up or I'll blow your ... head off." *Id.* The cashier did not see the gun but believed the defendant had one. *Id.* We held that threatening to shoot a victim is sufficient evidence "such that the victim could have reasonably believed that the appellant had a gun, which he was threatening to use if she did not give him the money as demanded." *Id.* at 144. We further noted that the "fact that a victim perceives there to be a weapon that remains unseen is sufficient whether or not, in fact, such a weapon exists." *Id.* (quoting *State v. Belton,* 949 S.W.2d 189, 192–93 (Mo.App. W.D.1997)). "It is not necessary that the victim of a robbery in the first degree actually see a weapon." *Belton,* 949 S.W.2d at 192.

Here, Jackson displayed what was perceived as a gun even though the victims were blind-folded so that they could not see it. Jackson, however, urges that principles of statutory construction support his argument that the gun must be seen by the victims. Jackson points out that the legislature specifically used the word "displayed." Conspicuous by its absence in the statute is any obligation of the victim to "see" the gun. Displaying a gun and seeing a gun are not synonymous. As we noted in *State v. Johnson,* when construing the word "exhibit," we held that "exhibit" means to show or display an item, which

---

6. As to the fourth victim, K.M., no rape or sodomy charges were submitted to the jury, therefore the issue raised in Point 1 is inapplicable to K.M. At oral argument the parties indicated that there was an issue as to the statute of limitations as to the sexual crimes committed against K.M.

"does not require an item to actually be observed but merely evidence of, or visible signs of the existence of the item be revealed." 964 S.W.2d 465, 468 (Mo.App. W.D.1998). The issue is whether the evidence and all reasonable inferences from the evidence were sufficient for a reasonable juror to make the factual finding required. *State v. Olten,* 326 S.W.3d 137, 142 (Mo.App. W.D.2010).

Here, Jackson stated he possessed a gun and would use it against the victims. Three of the victims testified that he put something against their bodies that was consistent with a gun barrel. This evidence and the reasonable inferences from it were clearly sufficient for a reasonable juror to conclude that Jackson possessed and displayed a gun. *Johnson,* 964 S.W.2d at 468.

### B. Gun Used in a Threatening Manner

■ After arguing the sufficiency of proof that Jackson displayed a gun in the commission of the crimes, Jackson further asserts that whatever "unknown object" was used in the crimes was certainly not used in a threatening manner. We disagree.

Jackson told K.W. that he had a gun and could kill her. Jackson told K.M. that he had a gun as he placed an object against her neck. He then threatened to kill her as she resisted him by keeping her legs together. Jackson told J.B. that he had a gun, would blow her brains out if she moved and pressed a cold, metallic object against her cheek. Jackson told B.G. that he had a gun and placed an object against her temple. Thus, based on our holding in *Lewis,* the threat to use a gun was sufficient evidence for a reasonable juror to conclude that the defendant possessed one. Moreover, based on *Johnson,* since a gun can be displayed without being seen, it was not necessary for the victims to physically see the gun in order for it to have been displayed.

Jackson points to only one Missouri case, *State v. Payne,* in support of his argument. 250 S.W.3d 815 (Mo.App. W.D. 2008). In *Payne,* we reversed a conviction where there was insufficient evidence to support a second-degree assault conviction because the jury instructions erroneously referred only to the use of a "deadly weapon" and not to a "dangerous instrument." *Id.* at 818. Since the object used in the attack was not seen by the victim and thus could not be identified as one of the statutorily defined "deadly weapons," the conviction could not stand. *Id.* at 821.

We find *Payne* inapposite. First, *Payne* involved an instructional error in that "or a dangerous instrument" was omitted from the instruction. Second, the argument that Jackson attempts to glean from *Payne*—that specific identification of the type of object used as a weapon is required—fails here. Jackson told the victims that he had a gun, and there was additional evidence that created a reasonable inference from which the jury could find that he did in fact "display" a gun when he placed it against their bodies.

Jackson further contends that the "unknown object" was not used in a threatening manner. He argues that "given the circumstances under which the object was used, it cannot be considered a dangerous object ... [t]he object was merely placed against the victims' heads or necks." He further argues that "[i]t was not used as a bludgeon or swung or thrown at the victim." Contrary to this assertion, Jackson threatened to shoot or kill the victims with a gun, which the jury was free to believe or disbelieve. *Taylor,* 373 S.W.3d at 518 (citation omitted). "The jury also resolves all conflicts in the evidence, and we will not second guess the jury's judgment." *Id.*

Since we have already established that evidence presented by the State was sufficient for a reasonable juror to conclude that Jackson displayed a gun, we need not address Jackson's secondary argument that the object he used was not a dangerous instrument.

Point One is denied.

## II.

In Point Two, Jackson alleges that the trial court erred in accepting the jury's verdict on six of the counts because each fell within the "continuing course of conduct" for another charge and thus should not have been submitted as a separate crime.[7] Jackson claims that by being convicted of each of these counts as separate crimes, his right to be free from double jeopardy was violated.

### Standard of Review

■ "Whether a defendant is afforded the protections of the Double Jeopardy Clause is a question of law, which we review *de novo*." *State v. M.L.S.*, 275 S.W.3d 293, 296 (Mo.App. W.D.2008).

### Analysis on Point II

■ "The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, prevents a criminal defendant from being subjected to multiple punishments for the same offense." *State v. Thompson*, 361 S.W.3d 46, 50 (Mo.App. W.D.2011). "In determining double jeopardy, Missouri follows the separate or several offense rule rather than the same transaction rule."

*State v. Childs*, 684 S.W.2d 508, 510–11 (Mo.App. E.D.1984). "[A] defendant can be convicted of several offenses arising from the same set of facts without violation of double jeopardy." *Id.* at 511. *See also State v. Reando*, 313 S.W.3d 734, 738 (Mo. App. W.D.2010). In other words, one cannot be punished for the same offense twice, though there can be several offenses within the same conduct.

■ Jackson argues that he was punished numerous times for "the same offense." He raises this argument as to two of the four victims, K.M. and J.B. In K.M.'s case, Jackson was convicted of two separate counts of rape. Jackson argues that one of the counts was erroneous in that it was a "continuing course of conduct" of the same offense. Specifically, Jackson argues that since he was only able to partially penetrate K.M. on his first attempt, that the first and second attempts at full penetration constitute only one rape. As noted above, the undisputed facts are that Jackson fondled K.M. and partially penetrated her while on her couch. He then moved her to the floor, placed a pillow under her hips, and then fully penetrated her. He argues that, under these facts he should only have been charged with one rape against K.M.

With regard to J.B., Jackson contends that he should have only been charged with one rape of J.B. and not four. He also contends that he should have been charged with only one count of sodomy against J.B. instead of three. As noted above, the facts are that Jackson first committed sodomy by touching J.B.'s vagina with his hand and then with his mouth.

7. With regard to K.M., Jackson was charged with rape in Counts IV and V. He claims the rape underlying Count V occurred in the "continuing course of conduct" of the rape submitted in Count IV. With regard to J.B., Jackson claims that the sodomy in Counts XIII and IX were part of the continuing course of Count VII's sodomy offense. Also regarding J.B., he claims that the rapes in Counts XI, XII and XIV were each part of the continuing course of conduct of the rape in Count X.

He then got up and looked through drawers for a lubricant before touching her again with his hand. These were charged as two separate sodomies. After finding baby oil, he applied it to himself and partially penetrated J.B. with his penis. He then got up and looked for another lubricant. He then touched her vagina again with his hand, which was charged as a third act of sodomy. Jackson then partially penetrated her with his penis using the Vaseline. He attempted a third time and partially penetrated her with his penis. He then found a pillow and placed it under her hips and fully penetrated her with his penis. J.B. testified that Jackson was in her home for approximately four hours. Jackson was charged with four counts of rape regarding J.B. Jackson argues that he should have only been charged with one count because each partial penetration of J.B. was part of one rape in that his intent was to achieve only one full penetration with his penis.

### A. Each Penetration is a Separate Rape by Statute

Although Jackson claims that his rapes of the victims were all part of one continuing act, "generally rape is not a continuing offense, but each act of intercourse constitutes a distinct and separate offense." *Childs,* 684 S.W.2d at 511 (quoting *State v. Dennis,* 537 S.W.2d 652, 654 (Mo.App. 1976) (internal quotation marks omitted)). Section 566.010 defines sexual intercourse as "any penetration, however slight, of the female sex organ by the male sex organ, whether or not an emission results." § 566.010(1) (RSMo 1978). As this court noted in *Vaughan v. State*:

> Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder, an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact he has already committed one

sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and further danger to the victim.

614 S.W.2d at 722–23 (citation omitted).

Further, "[c]ertainly it cannot be held that a man who has raped a woman once may again assault and ravish her with impunity." *Childs,* 684 S.W.2d at 512 (quoting *Dennis,* 537 S.W.2d at 654). Here, there is no dispute that Jackson penetrated the victims more than once. Each penetration is by statutory definition a separate rape. § 566.010(1) (RSMo 1978).

### B. Double Jeopardy Analysis in a Case of Multiple Penetrations

■ "The facts of each case will determine whether there has been a single assault or multiple rapes, including the factors of time, place and defendant's intent." *State v. Hamilton,* 791 S.W.2d 789, 795 (Mo.App. E.D.1990) (citing *Vaughan v. State,* 614 S.W.2d 718, 722 (Mo.App. W.D. 1981)). "If the defendant has an opportunity to reconsider his actions, each assault separated by time is considered a separate offense." *State v. Tyler,* 196 S.W.3d 638, 641 (Mo.App. W.D.2006) (citation omitted).

■ As noted above, in double jeopardy analysis, the factors we evaluate in considering whether the offense was one or several offenses are time, place, and intent. *Hamilton,* 791 S.W.2d at 795 (internal citation omitted). As to the factor of time, at each partial penetration, Jackson reassessed the situation, changed something in the scenario (added pillows, lubricants, left the room and returned etc.) and then penetrated again. During each penetration, the blind-folded victim was violated. At each partial penetration, Jackson had a chance to reconsider his actions

and could have stopped. But he did not. Jackson spent hours in each victim's home.

As to the factor of place, evidence was that with regard to K.M., she was first attacked on the couch and then on the floor. As to J.B., she was taken to the bedroom where the various sexual acts took place. At one point, she was instructed to get under the covers of the bed. She was also told to insert her diaphragm. Jackson twice got up and rummaged through drawers in order to find different lubricants. Clearly, these facts do not support one continuous, uninterrupted act that did not allow for Jackson to reconsider his actions. Thus, under *Tyler*, each offense was a separate crime since Jackson had time to reconsider what he was doing and could have stopped and left. Just as in *Vaughan*, where the "evidence showed two rapes occurred, separated by at least twenty-five minutes and an act of sodomy," here Jackson took his time with the victims and proceeded to commit each offense using a different place or position. *Vaughan*, 614 S.W.2d at 723 (holding that no error occurred where appellant was properly convicted of two counts of rape without contravention of double jeopardy principles). In *Vaughan*, the defendant raped one person twice in the same location but committed sodomy in between. *Id.* at 722. Evidence was that the victim tried to engage the attacker in conversation but to no avail. *Id.*

Regarding place, the two rapes of K.M. were committed in different locations within the house. The four rapes of J.B. took place in her bedroom but the time span of over four hours diminishes the argument that these were one act.

We now turn to the issue of Jackson's intent. Jackson argues that the rapes of each victim were a "continuing course of conduct" because he was acting upon a single intent which was to "achieve full penetration." This same argument was rejected by the Eastern District in *State v. Childs*, 684 S.W.2d 508 (Mo.App. E.D. 1984). There, a defendant was convicted of three separate counts of raping a teenager. In that case, he got on top of her and raped her, then turned her on her side and raped her, then again raped her from on top. *Id.* at 511. The defendant argued that he was only trying to reach ejaculation. *Id.* But "ejaculation is not a necessary element of the crime of rape." *Id.* (citation omitted).

Just as in *Childs*, full penetration is not an element of rape. "[T]he offense of rape does not require full penetration; instead, any penetration, however slight, is sufficient for conviction." *State v. Evans*, 802 S.W.2d 507, 516 (Mo. banc 1991). *See also State v. Leigh*, 580 S.W.2d 536, 540 (Mo. App. E.D.1979). Under the facts of this case, each attempt at full penetration constitutes a separate rape, regardless of Jackson's intention because each was separated by some other intervening action or period of time.

While our holding in *Vaughan* considers the defendant's intent as a factor in determining whether the rape was one continuous rape or separate crimes of rape, here, Jackson essentially argues that his personal goal of achieving "full penetration" is the same as having an intent to commit a singular, isolated crime. Contrary to Jackson's assertions, we do not find that having a singular goal is the same as committing a singular crime.

The legislature statutorily defined rape as penetration, however slight. § 566.010(1) (RSMo 1978). Regardless of the defendant's intent, we are to ascertain the intent of the legislature from the language used, to give effect to that intent and to consider the words in their plain and ordinary meaning. *State v. Rousseau*, 34 S.W.3d 254, 259 (Mo.App. W.D.2000)

(citation omitted). Based on the plain language of the statute, as well as rules of statutory interpretation, under these facts, each penetration can be considered a separate offense.

### C. Sodomies as Separate Acts

 As for the sodomy counts, Jackson makes an identical argument that these offenses were also part of a continuing course of conduct and not separate offenses. We disagree and will not repeat our analysis on that issue. Moreover, we have specifically addressed this issue as to multiple acts of sodomy.

In *Bland v. State*, the defendant claimed a violation of double jeopardy when he was convicted of three acts of sodomy that arose from the "same transactions." 805 S.W.2d 192, 194 (Mo.App. W.D.1991). There we held that all three sodomies "constituted prohibited sexual acts involving various parts of his body and various parts of the body of the victim, which places all three counts within the wording and intent of § 566.060.1," the result being three separate acts although they arose from the same transactions. *Id.* at 194 (internal quotation marks omitted).

In *State v. Applewhite*, the Eastern District came to the same conclusion when it evaluated a double jeopardy claim in light of multiple assault charges. 771 S.W.2d 865, 870 (Mo.App. E.D.1989). There, the defendant maintained that "any assaults that were committed during the attempt to escape, were part of a continuing course of conduct [that] was being engaged in...." *Id.* at 870. The court rejected this argument and held that each separate assault was a separate crime, again noting that in determining double jeopardy in Missouri, we follow the "separate or several offense

rule," which allows a defendant to be convicted of several offenses that arise from the same transaction. *Id.* at 870–71.

A person commits sodomy "if he has deviate sexual intercourse with another person to whom he is not married, without that person's consent by the use of forcible compulsion." § 566.060.1 (RSMo Supp.1982 & Supp.1983). In 1983 and 1984, deviate sexual intercourse was statutorily defined as:

> any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person;

§ 566.010(2) (RSMo 1978).

Here, more than one act of sodomy was committed against J.B. over the course of four hours. Jackson committed sodomy with his hand, then with his mouth, then partially penetrated J.B. with his penis, then committed sodomy with his hand again. The statute defines deviate sexual intercourse as any act, singular. Under Missouri's several offense rule as exemplified in *Bland*, although the separate acts may be part of the same transactions or same set of circumstances, they are still separate offenses by law. 805 S.W.2d at 194. Just as in *Bland*, here "the multiple convictions for acts of sodomy are permissible and not within the prohibition against double jeopardy." *Id.* (citation omitted).

For all of the above reasons, Point Two is denied.

### III.

In Point Three, Jackson claims error in the trial court's overruling of his *Batson* challenges to three of the State's peremptory challenges from the venire panel.[8]

---

8. The record reveals that 279 persons comprised the venire panel. Of those, 45, or 1/6, identified themselves as Black or African-American. The final jury included 2 members who identified themselves as Black or African–American, or 1/6 of the sworn jury.

## Standard of Review

"When reviewing a ruling on a *Batson* challenge, we accord the circuit court great deference because its findings of fact largely depend on its evaluation of credibility and demeanor." *State v. Jackson*, 385 S.W.3d 437, 439 (Mo.App. W.D. 2012) (citing to *Kesler–Ferguson v. Hy-Vee, Inc.*, 271 S.W.3d 556, 558 (Mo. banc 2008) (internal quotation marks omitted)). "We will reverse the circuit court's decision only if it is clearly erroneous." *Jackson*, 385 S.W.3d at 440 (citation omitted). In order to find the decision clearly erroneous, we "must have a definite and firm conviction that a mistake was made." *Id.* (citation omitted).

## Analysis on Point III

The State attempted to use peremptory challenges to strike four venire persons who were black: S.W., V.A., S.D., and N.G.[9] Jackson objected on *Batson* grounds and following the State's explanations for the strikes, the court sustained the objection as to S.W. but overruled Jackson's objections as to V.A., S.D., and N.G. Jackson argues that he established that the State's stated reasons for the three overruled strikes were pretextual, thus rendering the court's rulings erroneous. Jackson contends that he proved that the State (1) failed to strike similarly situated white jurors, (2) adopted justifications that were not logically relevant to the case or that were not supported by the record, (3) struck black jurors who logically would have been good jurors for the State, and (4) engaged in a pattern of discrimination by questioning black venire persons more in depth and more aggressively than white venire persons.

There is a three-step procedure for addressing a *Batson* challenge. *Jack-son*, 385 S.W.3d at 440 (citation omitted). "In the first step, the party challenging the strike must object and make a *prima facie* case of racial discrimination by identifying the protected class to which the potential juror belongs." *Id.* (citation omitted). "In the second step, the proponent of the strike must present a specific and clear race-neutral reason for the strike." *Id.* "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The main issue at this stage is the facial validity of the explanation. *Id.* at 768, 115 S.Ct. 1769. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Id.* (citation omitted).

If the proponent of the strike gives a facially race-neutral reason for the strike, then the process moves to the third step. In the third step, the party challenging the strike must prove "purposeful racial discrimination." *Id.* at 767, 115 S.Ct. 1769. "To prove purposeful racial discrimination, the party challenging the strike must demonstrate that the proffered reason for the strike was merely pretextual and that the strike was, in fact, motivated by race." *Jackson*, 385 S.W.3d at 440 (citing *State v. Bateman*, 318 S.W.3d 681, 689 (Mo. banc 2010)). "To meet this standard, the party challenging the strike 'must present evidence or specific analysis' showing that the proffered reason was pretextual." *Jackson*, 385 S.W.3d at 440 (citing *State v. Johnson*, 930 S.W.2d 456, 460 (Mo.App. W.D.1996)). "The party cannot simply rely on conclusory allegations that the real motivation for the strike was racial in nature." *Jackson*, 385 S.W.3d at 440 (citation and internal quotation marks

---

9. To protect the identity of the venire panel members, we refer to them by their initials.

omitted). Factors that may be relevant to the determination of pretext include:

(1) the presence of similarly situated white jurors who were not struck,

(2) the degree of logical relevance between the explanation and the case to be tried in terms of the nature of the case and the types of evidence adduced,

(3) the striking attorney's demeanor or statements during *voir dire*, and,

(4) the circuit court's past experience with the striking attorney.

*Id.* (citations and internal quotation marks omitted).

■■■ "Because the circuit court is in a better position to observe trial counsel's sincerity and credibility and to observe the racial makeup of the jury panel, we rely on the circuit court to consider the plausibility of the striking party's explanations in light of the totality of the facts and circumstances surrounding the case." *Id.* (citation and internal quotation marks omitted).

Here, Jackson met step one of the three-step procedure by asserting a *Batson* challenge on the State's strike of venire persons S.W., V.A., S.D. and N.G.[10] The State then met step two of the procedure by offering race-neutral justifications for the three strikes in question as follows: (1) as to V.A., the State asserted that he had a registered sex offender in his family; (2) as to S.D., the State contended that she did not seem like she was tracking very well given that she did not understand the phrase "ring a bell"; (3) as to N.G., the State contended that she had a lot of involvement with crime including being a victim, being a witness to attempted murder, being arrested, as well as having various relatives involved in crime. As for N.G., the trial court added that she was very talkative, knew people who were shot, and that her demeanor suggested she had "a lot of issues." All of these constitute valid race-neutral reasons for the use of a strike. *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769.

The third step required Jackson to show evidence or specific analysis that these reasons were pretextual. As for V.A., Jackson contended that the State did not strike similarly situated white venire persons who had relatives who had been convicted of crimes. The State then identified a white female, juror number 28, whom the State struck because her step-brother was a convicted sex offender. The State further noted that it only struck those with connections to convicted *sex* offenses as opposed to non-sexual offenses.

Jackson then countered with what he perceived to be unfair questioning meant to disqualify V.A. in the individual *voir dire* regarding publicity. A review of the record indicates that V.A. volunteered responses to five separate questions in general *voir dire,* and indicated on his questionnaire that he had seen publicity about the case, which resulted in individual *voir dire* of this juror. Needless to say, more questions are usually asked of one who volunteers frequent responses or who indicates in a questionnaire or in *voir dire* an answer that would call his or her ability to serve on this jury into question. V.A., however, was not alone. Over seventy-five panel members underwent individual *voir dire,* with follow-up questions posed by the court and both parties in response to answers that they gave on the questionnaire or in general *voir dire.* As the State points out, panel members of all races were asked a varied number of follow-up questions based on the specifics of the

---

**10.** The trial court sustained Jackson's *Batson* challenge as to the strike of S.W., and that issue is not before this court.

issue at hand. The court asserted that it did not recall that more in-depth questioning occurred with V.A. than other similar venire members and concluded that there were valid race-neutral reasons to overrule the *Batson* challenge as to V.A.

With regard to S.D., Jackson asserted that although S.D. did not appear to understand one of the State's questions, that alone was not a sufficient reason to strike a juror. The court at first sustained the objection, saying that "the state of the law" was such that "an argument could be made that this was a pretextual strike." Additional argument from the State followed, during which the State referenced two white members who were struck for similar reasons of "not tracking" what was going on during *voir dire.* Later, the court "reversed" itself, deciding that since the case was complicated and dependent on DNA scientific evidence, the strike of S.D. based on her level of understanding was "reasonable."

With regard to N.G., Jackson asserted that there were three other panel members who were related to "people in custody" and yet were not stricken. The court, however, did not agree that the strike was pretextual and *sua sponte* noted that based on her demeanor and responses, N.G. clearly had "a lot of issues."

Step three of the *Batson* process was complete when, based on these explanations, the court deemed the three strikes to be race-neutral and determined that Jackson failed to prove pretext. As noted above, Jackson was required to prove "purposeful racial discrimination." *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769.

"One of the differences between a peremptory strike and a challenge for cause is that, in choosing to exercise a peremptory strike, an attorney or party 'is allowed a subjective evaluation of the honesty and accuracy of the statement of the venireperson.'" *State v. Dow,* 375 S.W.3d 845, 850 (Mo.App. W.D.2012) (citing *State v. Rollins,* 321 S.W.3d 353, 365 (Mo.App. W.D.2010)). "Hence, '[b]ecause weighing the legitimacy of the State's explanation for a peremptory strike is, by nature, a subjective exercise, 'we place great reliance in the trial court's judgment.'" *Dow,* 375 S.W.3d at 850 (citation omitted).

In this case, *voir dire* of the panel was a significant undertaking.[11] *Voir dire* lasted over three days, giving the trial court a lengthy opportunity to observe the venire persons, observe the attorneys and evaluate the State's explanations. As we noted in *Jackson,* the credibility of the State's prosecutor as well as the court's previous experience with that prosecutor are two relevant factors in determining pretext. 385 S.W.3d at 440. The court found the strikes legitimate and that Jackson failed to meet his burden of establishing that the State's explanations were pretexts for discrimination.

"We will reverse the circuit court's decision only if it is clearly erroneous." *Jackson,* 385 S.W.3d at 439 (citation omitted). In order to find the decision clearly erroneous, we "must have a definite and firm conviction that a mistake was made." *Id.* (citation omitted). Because the trial court did not clearly err in overruling any of Jackson's three *Batson* challenges, Point Three is denied.

---

**11.** Approximately 194 potential jurors completed a questionnaire in advance regarding their exposure to publicity surrounding the case. Over 75 potential jurors underwent individual *voir dire* over the course of two days based on their responses to the questionnaire. The remaining group participated in two general *voir dire* sessions conducted by the trial court, Jackson and the State, which occupied another full day.

## IV.

In Point Four, Jackson contends that the trial court erred in overruling Jackson's objections to testimony concerning the impact that the crimes had on the victims' lives.

### Standard of Review

■■■■ We review the admission of evidence for an abuse of the trial court's discretion. *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006). We will affirm the trial court's judgment unless the trial court's ruling is clearly against the logic of the circumstances, indicates a lack of careful consideration, and the error was so prejudicial so as to deprive the defendant of a fair trial. *Id.* at 223–24. "[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different." *State v. Prince*, 311 S.W.3d 327, 335 (Mo.App. W.D.2010) (citation omitted). " 'Victim impact evidence violates the constitution only if it is so unduly prejudicial that it renders the trial fundamentally unfair.' " *State v. McLaughlin*, 265 S.W.3d 257, 273 (Mo. banc 2008) (citing *State v. Gill*, 167 S.W.3d 184, 195 (Mo. banc 2005) (internal quotation marks omitted)).

### Analysis on Point IV

■■■ Jackson argues that the trial court erred in allowing victim impact testimony during the guilt phase [12] of the trial because it inflamed the jurors' passions and encouraged verdicts based on emotions rather than reasoned deliberation. As such, Jackson argues that his rights to due process and to a fair and impartial jury were violated.

Three of the four victims testified about the effect these crimes had on their lives. A close friend of each victim also testified both about the condition the victim was in when the friend arrived the night of the rape, as well as about changes in the victim's personality that the friend noticed following the rape. While Jackson did object to most of the testimony regarding the impact these crimes had on these victims, he failed to object to the testimony of K.M. regarding the impact the offenses had on her. As to this evidence regarding K.M., Jackson requests plain-error review. Because we find no error, plain or otherwise, we will not engage in a plain-error analysis.

■■■■ "Evidence should only be excluded if the prejudice caused by the evidence is wholly disproportionate to the value and usefulness of the evidence." *State v. Hernandez*, 815 S.W.2d 67, 74 (Mo.App. S.D.1991) (citations omitted). "Whether such offered evidence should be excluded is a matter for the trial court's discretion." *State v. Pollard*, 719 S.W.2d 38, 39 (Mo.App. E.D.1986). Lay testimony regarding the impact of a sexual offense on the victim is relevant and admissible. *Id.* at 40–41.

Here, the trial court allowed victim impact testimony from the victims [13] and from a close friend of each victim. Each friend who testified was the friend contacted by that victim on the night of the attack and immediately came over to assist her. Each was able to recall the condition of his

---

12. Because Jackson was found to be a prior persistent sexual felony offender, sentencing was performed by the trial judge and not the jury. There was thus no sentencing phase of the trial presented to the jury.

13. The transcript reflects that K.W. did not personally testify as to how the rape and robbery affected her behavior or personality. The other three victims, however, did testify about how the crimes changed their lives.

or her friend and each went to the hospital where the victim was taken.

Jackson first objected to the testimony of K.W.'s friend, who was the first witness to testify about the effect the crime had on any of the victims. Following Jackson's objection, the following discussion took place:

O'Toole: Can you describe her [K.W.'s] personality back then?

Allen: Judge I'm just going to object to this as totally irrelevant. It's cumulative. It's irrelevant.

O'Toole: Judge, the victim's emotional state, both before and after, the impact this crime had, is relevant and that's not something she has testified to thus far.

Court: I think there is some relevance to it and I'm going to allow it. Now I suppose to avoid repetition considering the fact the evidence in this case is not— this is not an identification case, witness identification case, it's probably not quite as relevant as in certain situations but I think it is absolutely relevant. If it becomes repetitive or extended, I'll sustain the objection, but I don't think so at this point. The objection is noted by the Court and overruled.

When Jackson again objected, the court reiterated its position as follows:

O'Toole: Can you describe for the jury what happened to her behavior after this incident?

Allen: I would argue this is victim impact evidence. Appropriate for sentencing phase, irrelevant for the guilt phase.

O'Toole: It's the emotion after the attack.

Court: Well, the thing of it is, I don't think the State can try this case in a vacuum. Okay? And so I think that they have a right to get into this material to some degree. Okay? Now, since the jury is not sentencing the Defendant and the like, I'm cognizant of the fact we don't need to go through a long extension of that kind of stuff; but it seems to me that you know they've got forcible compulsion they've got to prove. There was a robbery they have to prove. A variety of things. So I think to say that this woman was particularly shaken up or affected by this is a legitimate grounds [sic]. Now if it becomes a funeral dirge then I will certainly not allow it. Okay? I'm saying this now because I want both of you to understand the position I'm taking with these witnesses and with the other ones.

Allen: Okay.

Thereafter, a continuing objection was noted in the testimony of J.B. and her friend, as well as to B.G. and her friend. A review of the transcript reveals that rather consistently the witnesses testified that each victim's personality changed from a carefree, happy person to a more reserved, nervous, or fearful person. None of the victims ever slept alone again in the house where the crimes occurred.

## A. Force is an Element of Forcible Rape

As the court notes in its explanation of why it determined that the testimony was admissible, "the state is not required to try its case in a vacuum but may show and develop the circumstances of the crime and integral parts thereof." *State v. Feemster,* 628 S.W.2d 367, 369 (Mo.App. E.D.1982) (citations omitted). "Relevancy is found if the evidence logically tends to support or establish a fact in issue." *State v. Berry,* 609 S.W.2d 948, 954 (Mo. banc 1980) (citing *State v. Moore,* 435 S.W.2d 8, 11 (Mo. banc 1968)).

"Because defendant pled not guilty, he put in issue all facts constituting the *corpus delicti* ..." Berry, 609 S.W.2d at 954. (internal citation and quotation

marks omitted). "Hence, to establish guilt, all evidence related to any element of the crime of forcible rape became relevant." *Id.* "The victim's condition after the rape was pertinent to the issue of force ..." *Id.* Moreover, "[t]o establish the crime of rape, the essential elements of carnal knowledge by force against the will of the woman must be shown." *State v. Holland,* 534 S.W.2d 258, 264 (Mo.App. 1976) (citing *State v. Garrett,* 494 S.W.2d 336, 338 (Mo.1973)). In *Holland,* although the defendant argued that evidence concerning the victim's state of virginity prior to the rape was immaterial and unnecessarily inflammatory, the court disagreed and noted that "[t]he state cannot be unduly limited in its quantum of proof." *Id.* (citation omitted).

In this case, because Jackson presented a defense that no gun was used in the commission of these offenses, the level of fear each of the victims had after the events is probative as to whether a weapon was used during the offense. In other words, a reasonable juror could find that someone may be more traumatized following a crime in which a deadly weapon was used and her life was threatened than following a crime where no weapon was used. As the Southern District stated in *State v. Ogle,* 668 S.W.2d 138, 141 (Mo. App. S.D.1984), "[i]f there was no question but that a rape had occurred, such evidence would not be relevant, but where there is a question whether the complaining witness was *forcibly* raped, her condition long after the rape may be relevant." *Id.* (emphasis added).

**B. Evidence Can Be Potentially Prejudicial Yet Still Admissible**

 Finally, "merely because it may tend to prejudice the jury against a party does not necessarily render otherwise admissible evidence inadmissible." *State v. Morrow,* 541 S.W.2d 738, 743 (Mo. App.1976) (citing *State v. Mullen,* 528 S.W.2d 517, 523 (Mo.App.1975)). In fact most evidence offered by any party in any trial is intended to prejudice the fact-finder against the other party's position or cause of action and make the fact-finder look more favorably on the offering party's position or cause of action. "The admissibility of potentially prejudicial evidence is within the trial court's discretion." *Morrow,* 541 S.W.2d at 743 (citing *State v. Richardson,* 515 S.W.2d 557, 560 (Mo. banc 1974)).

Here, the trial court allowed limited testimony from each witness and the one close friend who came to her aid on the night of the crimes. The testimony did not introduce "new and controversial matter which would result in confusion of issues, constitute unfair surprise, or cause prejudice wholly disproportionate to the value and usefulness of the offered evidence" such that it should be excluded. *Morrow,* 541 S.W.2d at 744 (internal citation and quotation omitted). The testimony that the brutal attack had lasting effects on the victim would have been expected by a reasonable juror. "It is common knowledge that a violent crime can cause changes in the mental condition of a person." *Pollard,* 719 S.W.2d at 40 (citation and internal quotation marks omitted). As the court noted in *State v. Hughes* when it allowed testimony from two rape victims who testified as to the effects the rapes had on their lives, the testimony was non-prejudicial as it stated only "little more than [what] any sensitive juror can imagine [are] the consequences of multiple rapes." *Hughes,* 787 S.W.2d 802, 805 (Mo.App. E.D.1990).

The proper analysis, however, is still whether the testimony caused undue prejudice against the defendant so as to deprive him of a fair trial. *Forrest,* 183 S.W.3d at 223–24. Jackson admits that at trial, "defense counsel made clear from the start that the defense agreed that each of

the victims was sexually assaulted ... [t]here was no contention that the victims fabricated their stories or that they consented to a sexual encounter."

In light of the other properly admitted evidence overwhelmingly establishing the guilt of the defendant such as the abundance of DNA evidence and other physical evidence, Jackson is hard-pressed to establish prejudice in the admission of the victims' and their friends' testimony. "While the testimony is of doubtful relevance, we are unable to conclude it was prejudicial, particularly in view of the strong evidence of guilt." *Hughes,* 787 S.W.2d at 805. "Even if an abuse of discretion is shown, a defendant must prove that the abuse prejudiced his or her case, i.e., there was a reasonable probability that, absent the abuse, the verdict would have been different." *State v. Hope,* 954 S.W.2d 537, 542 (Mo.App. S.D.1997) (citing *State v. Barton,* 936 S.W.2d 781, 786 (Mo. banc 1996)).

Here Jackson failed to show how the specific evidence admitted in this case prejudiced him in such a way as to render the trial fundamentally unfair as is required under *McLaughlin.* 265 S.W.3d at 273 ("victim impact evidence violates the constitution only if it 'is so unduly prejudicial that it renders the trial fundamentally unfair.' ") Because we do not find that the testimony created prejudice and rendered the trial fundamentally unfair, we find no abuse of discretion in the trial court's admission of such evidence. Point Four is denied.

## Conclusion

The judgment of the circuit court is affirmed.

All concur.